FILED

17 MAR 29 AM 8: 57

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

MPL
DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| EDWARD JESUS ELIAS, | Case No.: 16cv0320-AJB (KSC) |
| Petitioner, | |
| v. | **REPORT AND RECOMMENDATION RE DENIAL OF PETITION FOR A WRIT OF HABEAS CORPUS** |
| SCOTT KERNAN, Secretary, | |
| Respondent. | |

Petitioner Edward Jesus Elias is a state prisoner proceeding pro se and in forma pauperis with a First Amended Petition for a Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254. (ECF No. 4.) He challenges his San Diego Superior Court convictions for two counts of first degree murder with special circumstances, for which he was sentenced to two consecutive terms of life imprisonment without the possibility of parole, later reduced to two consecutive terms of 25 years-to-life plus one year because he was 17 years old at the time of the crimes. (First Amended Petition ["FAP"] at 1-2.) He claims his federal constitutional rights were violated because insufficient evidence supports the guilty verdicts and the special circumstance findings (Claims 1-2), by prosecutorial misconduct (Claim 3), and instructional error (Claim 4). (Id. at 6-9, 15-30.)

Respondent has filed an Answer and lodged portions of the state court record. (ECF Nos. 12-13.) Respondent argues habeas relief is unavailable because the state court

1    adjudication of Petitioner's claims is neither contrary to, nor involves an unreasonable

2    application of, clearly established federal law within the meaning of 28 U.S.C. § 2254(d),

3    and because any errors with respect to Claims 3 and 4 are harmless. (Memorandum of

4    Points and Authorities in Support of Answer ["Ans. Mem."] at 9-28.)

5    After the Answer was filed, Petitioner filed a motion for leave to amend the First

6    Amended Petition for the stated purpose of responding to the argument in the Answer that

7    he had not satisfied the provisions of 28 U.S.C. § 2254(d). (ECF No. 16.)  The Court

8    construed that filing as a Memorandum of Points and Authorities in Support of the First

9    Amended Petition. (ECF No. 17.)  Petitioner has also filed a Traverse. (ECF No. 25.)

10    For the following reasons, the Court finds that federal habeas relief is unavailable

11    because Petitioner has not satisfied the provisions of 28 U.S.C. § 2254(d), as he has failed

12    to show that the state court adjudication of any claim is contrary to, or involves an

13    unreasonable application of, clearly established federal law, or that it is based on an

14    unreasonable determination of the facts.  In addition, even if Petitioner could satisfy those

15    standards with respect to Claims 3 and 4, it is clear that any errors as to those claims are

16    harmless.  The Court therefore recommends the Petition be denied.

17    **I.    PROCEDURAL BACKGROUND**

18    A two-count Second Amended Information filed in the San Diego County Superior

19    Court on March 8, 2012, charged Petitioner and his codefendant Leopoldo Chavez with

20    two counts of first degree murder in violation of Penal Code section 187(a), and alleged

21    they were armed with a firearm within the meaning of Penal Code section 12022(a)(1).

22    (Lodgment No. 1, Clerk's Tr. ["CT"] at 16-19.)  Two special circumstance allegations

23    charged that the murders were committed during the commission of a robbery within the

24    meaning of Penal Code section 190.2(a)(17), and that the defendants committed more than

25    one murder within the meaning of Penal Code section 190.2(a)(3). (Id.)

26    On March 26, 2012, following a joint trial, a jury found Petitioner and Chavez guilty

27    on both counts, and returned true findings on the firearm use and special circumstance

28    allegations. (CT 420-24, 474-78.)  On June 21, 2012, both defendants were sentenced to

1    two consecutive terms of life without the possibility of parole plus one year. (CT 431, 485;

2    RT 915-17.)

3         Petitioner and his codefendant filed a consolidated appeal, raising, *inter alia*, the

4    claims raised here. (Lodgment Nos. 3-4.) The appellate court affirmed the convictions but

5    remanded for resentencing on the basis that both defendants were 17 years old at the time

6    of their offenses and intervening law had modified the factors to be considered before

7    sentencing juvenile offenders to life without parole. (Lodgment No. 5, <u>People v. Chavez,</u>

8    <u>et al.,</u> No. D061946 (Cal.Sup.Ct. July 22, 2014).) Petitioner thereafter filed a petition for

9    review in the California Supreme Court presenting the claims raised here. (Lodgment No.

10   6.) On October 29, 2014, the petition for review was summarily denied without a statement

11   of reasoning or citation of authority. (Lodgment No. 7.) Petitioner was later resentenced

12   to two consecutive terms of 25 years-to-life plus one year. (FAP at 1.)

13   **II.    TRIAL PROCEEDINGS**

14        Because Petitioner is challenging the sufficiency of the evidence, the Court will

15   review the trial testimony in detail. First, it is useful to set forth a brief summary of the

16   evidence as provided by the state appellate court:

> [T]he 20– and 23–year–old victims were sailors enlisted in the United States
> Navy, one of whom was driving a brand new Toyota pickup truck.  The
> victims were murdered at a location where young adults, including other Navy
> personnel and their friends, frequently gathered to drink, listen to music and
> socialize around a number of bonfires. Multiple witnesses recalled that
> Chavez, who was 17 at the time of the killings, was at the scene of the bonfires
> shortly before the murders took place. The witnesses also uniformly recalled
> that Chavez was in the company of at least one other teenager or young adult
> and that Chavez and his companion were acting in a very aggressive and
> threatening manner toward other Navy personnel and their friends present at
> the bonfires. Four days after the murders, Chavez was stopped in Tijuana,
> Mexico while driving the 20–year–old victim's new Toyota pickup truck.
> Importantly, some years after the murders, investigators were able to match
> DNA retrieved from the pants pocket of the 20–year–old victim with Chavez's
> DNA.
>
>     The witnesses' identification of Chavez as being present at the bonfires
> shortly before the murders, his possession of the truck following the murders,

1   and his DNA in the pants pocket of one of the victims, make a strong case
2   Chavez participated in the truck robbery and the killings.

3        With respect to Elias, who was also 17 at the time of the murders, the
4   record is sufficient to sustain his conviction and the special circumstances
     findings.  Within just a few hours after the killings, investigators found a
5   cigarette butt at the scene of the murders among items that had been taken out
6   of the Toyota truck.  Later, investigators were able to match DNA on the
     cigarette butt with Elias's DNA.  Elias's DNA was also found on a cup
7   recovered from inside the victim's truck when it was stopped in Tijuana after
8   the murders.  In addition to the DNA on the cup, Elias's fingerprints were
     found both inside and outside of the truck.
9
10       The cigarette butt Elias left at the scene of the murders, with ash still
     attached, very near items discarded from the truck and recovered very shortly
11  after the murders, places Elias at that location at or near the time of the
12  murders.  Elias's DNA, found in the cup retrieved from the truck, and his
     fingerprints, found both inside and outside of the truck, place Elias in the truck
13  with Chavez shortly after the time it was stolen and near the time of the
14  killings.  These circumstances support the conclusion Elias was Chavez's
     companion at the bonfires and an active participant in the robbery and killings.
15

16  People v. Chavez, 228 Cal.App.4th 18, 21, 175 Cal.Rptr.3d 334, 336 (2014).

17       Rita Ellis testified that her son Cliff Ellis enlisted in the Navy and was stationed in
18  San Diego in the summer of 1993. (Lodgment No. 2, Reporter's Tr. ["RT"] at 89-90.) She
19  said Cliff always dressed nicely, including tucking in his shirt with a nice belt, and always
20  carried a wallet, but his wallet, military identification card and the telephone calling card
21  he used on a regular basis to call home were missing from his personal effects when they
22  were returned to her after he was murdered. (RT 91-93.) Cliff Ellis' father Charles testified
23  that he co-signed a loan for Cliff to buy a new, white 1993 Toyota pickup truck when Cliff
24  was stationed in San Diego. (RT 94-95.)  Cliff was murdered less than two months later,
25  and when the pickup truck was recovered in Tijuana and returned to Charles, it had less
26  than one thousand miles on the odometer. (RT 95-96.)

27       Willis Pope testified that he grew up in Mississippi with his friend Cliff Ellis. (RT
28  104-05.)  They both joined the Navy and were stationed in San Diego in 1993, where they

4

1  hung out together nearly every day.  (RT 105-06.)  Pope said Ellis was very proud of the

2  new pickup truck he had purchased about two months before he was murdered, and that he

3  kept it immaculately clean both inside and out.  (RT 107-08.)  Ellis always dressed well

4  and had a laid-back, non-aggressive personality.  (RT 108.)

5        Pope testified that on September 24, 1993, Ellis came to Pope's barracks about 5:00

6  p.m., accompanied by Ellis's friend Keith Combs, and they were joined by Pope's friend

7  Sean Milligan.  (RT 108-09.)  After dinner Ellis drove the four of them in his truck to an

8  area in Imperial Beach near Palm Avenue and the 805 freeway.  (RT 110.)  Although that

9  area was developed at the time of trial in 2012, Pope testified that in 1993 it was a rugged,

10  undeveloped area used by off-road vehicles.  (RT 110-11.)  They hung out drinking around

11  a bonfire, a typical activity for them growing up in Mississippi, and one of them had a

12  camera and took pictures.  (RT 111-14.)  The four of them returned to the base about

13  midnight, requiring them to show their military identification to get on base, and went to

14  the barracks.  (RT 115-16.)  Pope left to make a 30 minute phone call home, and when he

15  returned Ellis and Combs were gone and he never saw either of them again.  (RT 118.)

16  Pope testified that he had assumed they went back to their ship because he thought Combs

17  had duty in the morning, but acknowledged that he had told an investigator in 1993 that

18  Ellis wanted to go back to the bonfire area and keep partying and Pope declined because

19  he had duty the next morning.  (RT 118, 127.)

20        Sean Milligan testified that he was friends with Pope when they were both in the

21  Navy and stationed in San Diego in 1993, and that he met Cliff Ellis through Pope.  (RT

22  130.)  Milligan and Pope frequented a country and western bar on the 32nd Street Navy

23  base called Anchors and Spurs, and Ellis accompanied them there once or twice.  (RT 131.)

24  On September 24, 1993, Milligan went to Pope's barracks and met Ellis and Combs there.

25  (RT 132.)  After the four of them ate pizza in the barracks, they grabbed some beer and

26  Ellis drove them in his new pickup truck to an off-road area where they started a bonfire

27  and hung out.  (RT 133-34.)  They all returned to the base together, which required showing

28  their military identification, and he never saw Ellis or Combs again.  (RT 137-38.)

1    Stephen Forde testified that he was in the Navy in 1993, that he hung out at the
2  Anchors and Spurs bar, and on three occasions had attended bonfires near Palm Avenue
3  after the bar closed.  (RT 160.)  He attended a bonfire on September 24, 1993, arriving
4  between midnight and 1:00 a.m., with a number of other young military people.  (RT 160-
5  64.)  Forde said he parked his truck next to Cliff Ellis' truck, that there were twenty or
6  more people around their bonfire, and that there were two or three other bonfires nearby.
7  (RT 165-67.)  Forde saw two young men in the area who concerned him because he thought
8  were "kind of smart asses."  (RT 171-73, 176.)  Although he did not remember at trial, he
9  told an investigator in 1993 that those men were Mexican, and that their mannerisms caused
10  him to move away from them to the other side of the bonfire.  (RT 174.)  Less than an hour
11  after that incident, between 4:00 and 5:00 a.m., before sunrise, Forde left the area while
12  Ellis' truck was still there.  (RT 174-75, 189.)  On February 9, 1994, Forde picked out a
13  photograph of codefendant Chavez from a photographic lineup as resembling one of the
14  two young Mexican men he saw that night.  (RT 177-80, 399.)

15    Justin Duvall testified that he was in the Navy in 1993, was stationed in San Diego,
16  and went to the Anchors and Spurs bar nearly every weekend.  (RT 194-95.)  He had often
17  heard of people going to the Palm Avenue area after the bar closed to hang out and drink
18  beer around bonfires, and went for the first time during the early morning hours of
19  September 25, 1993.  (RT 195-96.)  He had not been drinking at all that night, parked his
20  car at the end of Palm Avenue about 3:00 a.m., and walked to a bonfire.  (RT 196-97, 200-
21  01.)  There were about fifty people around the bonfire, made up mostly of the Anchors and
22  Spurs crowd, that is, short haired, clean-cut young Navy people dressed in an off-duty,
23  country and western style.  (RT 199.)

24    Duvall testified that about 5:00 a.m., just as the sun was coming up and most of the
25  people were leaving, three Hispanic males, about 17 or 18 years old, wearing baggy
26  clothes, approached the group, and two of them asked for beer.  (RT 201-02.)  Duvall's
27  group was playing country and western music, and the two young males said: "Fuck you,
28  White cowboy," and: "You fucking cowboys, we don't like your music."  (RT 202, 212.)

1    Duvall testified they looked like gang members, and that one had his right hand behind his

2    back "like he had a gun," although the trial judge instructed the jury to disregard those

3    remarks.[1]  (RT 202-03.)  Duvall said that when his group did not give them beer they went

4    to another bonfire, but he felt uncomfortable and decided to leave.  (Id.)  He told an

5    investigator in December 1993 that those three young males had arrived in a light blue Ford

6    Courier with a camper shell.  (RT 204-05.)  The investigator showed Duvall a photographic

7    lineup, from which he identified codefendant Chavez as one of the three young Hispanic

8    males who had approached him in an aggressive manner.  (RT 209-10, 399.)

9        Kristeen Kowalow testified that she and her roommate Pam Rios were at the Anchors

10   and Spurs bar on the evening of September 24, 1993, and went to a bonfire near the 805

11   freeway and Palm Avenue after closing, as she had several times before.  (RT 243-45.)

12   She parked her car at the end of Palm Avenue and rode in with someone driving a truck.

13   (RT 245.)  There were about fifty people and ten vehicles around their fire, including a

14   newer white pickup truck.  (RT 245-48.)  When interviewed by an investigator a couple of

15   months later, she identified Cliff Ellis and his white pickup truck as being there that night,

16   and said that Ellis' pickup truck was still there after most people left.  (RT 249.)

17       Kowalow said that at one point a small pickup truck with a camper shell and three

18   19 or 20-year old Hispanic men drove up, parked near the fire, and two of them sat on the

19   back of their truck.  (RT 250-51.)  Kowalow spoke to them briefly but immediately felt

20   uncomfortable and decided to leave because the two men did not fit in with the rest of the

21   people around the fire.  (RT 251-52.)  She said that although the Anchors and Spurs group

22   contained White, Black and Hispanic individuals, they were all short-haired, clean shaven

23   military people in their twenties, whereas the two Hispanic males were teenagers dressed

24   in baggy clothes with a "different demeanor."  (RT 254-56.)  She had previously described

25   them as "gang bangers," but the trial judge ruled that description inadmissible.  (RT 253.)

26   _____

27   [1]  The trial judge also excluded proffered prosecution evidence that four young Hispanic males with gang
28   monikers Bandit, Lazy, Weasel and Shady hung out together, and that Petitioner was known as Lazy and
     Chavez was known as Weasel.  (RT 456-62.)

1    When she and her friends left around 5:00 a.m., the only people around the fire were two
2    white male sailors and the two young Hispanic males, and the only vehicles were the pickup
3    truck similar to Cliff Ellis' and the Hispanic males' pickup truck with the camper shell.
4    (RT 255-56, 266.)  Kowalow could not say for sure if Ellis was there that night, but she
5    later picked codefendant Chavez from a photographic lineup, although she said she was
6    not sure where she recognized him from.  (RT 256, 266, 399.)

7         Mary Macy testified that she and her friend Susan Stuhr were regulars at the Anchors
8    and Spurs bar in 1993, and were part of a group of people from the bar who often went to
9    bonfires in the area of the 805 freeway and Palm Avenue after closing, including September
10   25, 1993.  (RT 285-86.)  On that occasion she drove her Chevy Blazer there with Stuhr and
11   two Navy men, and backed her vehicle up to the bonfire.  (RT 286.)  Just as they arrived a
12   brand new pickup truck parked next to her with two Navy men who she thought were from
13   Anchors and Spurs.  (RT 289.)  She remembered the truck because it was the type she
14   wanted to buy, and identified it from a photograph as Cliff Ellis' truck.  (RT 289, 298.)
15   The truck later moved about thirty yards away, but was still by the bonfire.  (RT 291.)

16        At some point Macy noticed that the music had stopped and most of the other
17   vehicles had left, which gave her a bad feeling.  (RT 292-93.)  Just before 5:00 a.m., while
18   it was still dark, as she was getting into her truck to leave, a small pickup truck with a
19   camper shell pulled up alongside her, and two young Hispanic males spoke to her, but she
20   ignored them and waived them off because she did not want to speak to them.  (RT 293-
21   97, 306.)  The only other vehicle there was Ellis' truck, and she decided to drive by it before
22   leaving to make sure the men were not passed out or asleep inside, but nobody was inside
23   the truck or around it, so she left.  (RT 298.)

24        Barbara Behmke testified that in 1993 she was a regular member of the group of
25   people who attended bonfires near Palm Avenue after the Anchors and Spurs bar closed.
26   (RT 312.)  She went to the bar on the evening of September 24, 1993, and drove her Chevy
27   Blazer to the bonfire afterwards with her roommate and two friends.  (RT 313-15.)  She
28   knew Cliff Ellis and Keith Combs from the Anchors and Spurs bar, and saw them out at

1  the bonfire that night in Ellis' white pickup truck. (RT 316.) About 4:00 a.m., her friend
2  Sean was injured in a fight and she drove him to a hospital. (RT 317-19.) Behmke returned
3  to the bonfire to pick up her friend and her jacket, arriving about 4:30 or 4:45 a.m. (RT
4  321-22.) There were still several vehicles and people at the bonfire, and she noticed four
5  young Hispanic males who had not been there when she left. (RT 323-24.) Two of those
6  men approached her vehicle and made her feel uncomfortable by making sexual gestures
7  and saying things of a sexual nature, so she left after about five minutes. (RT 325-26.)
8  Behmke said Ellis' pickup truck was still there, but she did not see Ellis or Combs. (RT
9  325.) In December 1993, she identified codefendant Chavez from a photographic lineup
10  as one of the young Hispanic males. (RT 327-28, 399.)

11  Scott Hultquist testified that in 1993 he regularly rode his dirt bike in the area around
12  Palm Avenue and the 805 freeway, when it was undeveloped open space. (RT 340.) He
13  arrived at the area around 6:00 a.m. on September 25, 1993, sat drinking coffee at the end
14  of Palm Avenue waiting for the fog to lift, and did not hear any gunshots or see any vehicles
15  leave the area. (RT 341-45.) Juanita Johnson testified that she and her daughter found two
16  bodies in that area about 7:00 a.m. on September 25, 1993, and that it was very foggy at
17  the time. (RT 140-45.)

18  David Swiskowski, a retired San Diego Police Sergeant, testified that in 1993 he was
19  assigned to the homicide team which investigated this case. (RT 349-51.) On September
20  25, 1993, he arrived at a dirt area near the 805 freeway and Palm Avenue and supervised
21  the preservation and collection of evidence. (RT 351-65.) There were no wallets or
22  identification found on the two victims, who were lying parallel to each other on their backs
23  about sixteen feet apart, although two ball caps were lying by their bodies with their names
24  written inside. (RT 368-69, 375.) Keith Combs had a gunshot wound in his back with
25  powder marks and stippling which indicated it was fired from close range, about three or
26  four inches away. (RT 369-71.) Combs also had two gunshot wounds to his head, one
27  behind his ear and one on the top of his head, and a camera lying at his feet. (RT 371.)
28  Cliff Ellis was shot once in the chest and twice in the head, had his shirt untucked and his

16cv0320-AJB (KSC)

1  belt buckle undone with dirt and vegetation stuck to his face and body, and looked as if
2  someone had stepped on his body. (RT 372-74.)

3      Six .22 caliber shell casings were recovered at the scene, one from underneath
4  Combs' body, which in Swiskowski's opinion suggested he fell on the casing after he was
5  shot. (RT 375-82.) The parties stipulated that all six .22 caliber shell casings were fired
6  from the same gun. (RT 427.) A white box recovered near Ellis' body appeared to have
7  come from his truck, and contained car wax, a scrub brush, a college pamphlet, a map, and
8  a can of Armor-All cleaner. (RT 383-84.) A cigarette butt with the ash still attached was
9  collected from between the two bodies. (RT 384-88.) Another cigarette butt with an ash
10 attached was collected from closer to Ellis' body. (RT 388-90.) The fact that ash was still
11 attached to the cigarette butts and they were lying in an area with many footprints and tire
12 tracks indicated in Swiskowski's opinion they had been dropped recently. (RT 390-91.)

13     On September 29, 1993, Swiskowski was notified that Ellis' pickup truck was in
14 custody in Tijuana, along with Chavez who was stopped while driving it, and he went there
15 with an evidence technician where they fingerprinted and collected evidence from the
16 vehicle. (RT 395-97.) The keys were with the truck, and neither the ignition nor the door
17 locks had been tampered with. (RT 419.)

18     Dr. Leena Jariwala testified that she was a deputy medical examiner for the County
19 of San Diego in 1993. (RT 495.) She examined the bodies of Cliff Ellis and Keith Combs
20 where they were found, and opined they had been killed between 1:30 a.m. and 5:20 a.m.
21 (RT 504-06.) Dr. Jariwala later performed autopsies on the bodies. (RT 509.) The two
22 bullet wounds in Combs' head were from a gun fired a few feet away, whereas the bullet
23 wound to his back was from a gun fired very near the body; any of the three wounds could
24 have been fatal, and blood in Combs' lungs indicated that he took at least a few breaths
25 after all three shots and might have lived for a few minutes. (RT 509-24.) Combs had a
26 blood alcohol level of 0.03 percent and no defensive wounds. (RT 525.) There were two
27 bullet wounds to Ellis' head, one of which was caused with the gun almost touching the
28 skin, and one to his chest with an exit wound in his back; all three wounds could have been

1   fatal and any of them would have caused him to fall to the ground; Dr. Jariwala was unable
2   to say in what order the wounds to either victim occurred, although Ellis was alive when
3   he was shot in the head. (RT 526-40.) Ellis had a blood alcohol content of 0.03 percent,
4   and abrasions and bruises on his face and leg, a scratch below his eye and around his neck,
5   and an abrasion on the back of his head. (RT 540.)

6          Dr. Glenn Wagner, the Chief Medical Examiner for San Diego County, testified that
7   based on the trajectory of the bullets in Keith Combs' body, either the shooter, the weapon
8   or Combs was moving at the time the shots were fired, and it did not appear that Combs
9   was wearing his hat when he was shot in the head. (RT 551, 553.) He said Cliff Ellis
10  would have been capable of movement after being shot in the chest and temple, but not
11  after being shot in the back of the head. (RT 555.)

12         Robert Michael Callison testified that he worked as an evidence technician for the
13  San Diego Police Department homicide squad in 1993, collected the items of evidence
14  identified by Swiskowski, and said the brand of the cigarette butts collected at the scene
15  was Marlboro. (RT 421-34.) Lisa Combs testified that her husband Keith Combs smoked
16  Marlboro cigarettes. (RT 100.) Gary Dorsett testified that he was employed as an evidence
17  technician with the San Diego Police Department in 1993, and that he collected forty-six
18  latent fingerprints from Ellis' truck, and five fingerprints from items in the truck, including
19  a red cup and a plastic bottle. (RT 472-80.) There were stains on the floorboard of the
20  truck and a clutter of trash inside, which included an ace bandage. (RT 478-81.)

21         Gloria Pasqual, a latent fingerprint examiner with the San Diego Police Department,
22  testified that she found Cliff Ellis' fingerprints on the college pamphlet recovered from the
23  white box which came from Ellis' truck. (RT 564.) Pasqual found Petitioner's fingerprints
24  on the rear view mirror, interior rear sliding window, interior passenger side window, front
25  hood, and exterior passenger door of Ellis' truck, as well as on the plastic bottle found in
26  the truck. (RT 565-72.) She found Chavez' fingerprints on the front passenger fender,
27  interior rear sliding window, exterior driver's side door wing window, driver's door mirror,
28  exterior driver's door handle, front hood, and driver's side door jamb. (Id.)

16cv0320-AJB (KSC)

1    Shawn Montpetit, a DNA technical manager with the forensic biology unit of the
2    San Diego Police Department crime lab, testified that Combs and codefendant Chavez were
3    major contributors to DNA found on the inside of the pockets of the pants Combs was
4    wearing when his body was found. (RT 585-93.)  Petitioner's DNA was found on the
5    cigarette butt recovered between the two bodies near the white box, and Combs' DNA was
6    found on the cigarette butt found closer to his body. (RT 389, 594-95, 602.)  Chavez' DNA
7    was found on the bandage found in Ellis' pickup truck, and DNA from Petitioner and
8    Chavez were found on the red cup recovered from the truck. (RT 603-04.)  Montpetit said
9    that because the evidence sat at room temperature at police headquarters for fifteen to
10   sixteen years, the DNA may have degraded and decreased the chances of more useful
11   results. (RT 586-87.)  The People rested. (RT 611.)

12       The defense moved for a directed verdict, arguing that because the jury was to be
13   instructed that if there are two equally reasonable inferences to be drawn from the evidence,
14   one of innocence and one of guilt, they must draw the inference of innocence, the only
15   possible verdict would be not guilty because the circumstantial evidence in the case could
16   lead only to an inference of innocence. (RT 668.)  The trial judge denied the motion on
17   the basis that the evidence provided a very powerful inference that Petitioner and Chavez
18   had killed and robbed the victims, and a weak inference that they just happened to be in
19   the area around the time someone else committed the crimes. (RT 669-70.)

20       Lisa Dimeo, a forensic specialist, testified for the defense that she had examined the
21   autopsy reports and photographs of the crime scene. (RT 677.)  She opined that because
22   the pool of Ellis' blood was not next to his head and there was debris on his clothing, he
23   fell forward and laid on his stomach for minutes or hours before being rolled onto his back.
24   (RT 679-83.)  The defenses rested and there was no rebuttal evidence. (RT 711-12.)

25       The jury was instructed. (RT 719-48.)  Petitioner contends in Claim 4 here that the
26   burden of proof was diluted by the instruction, which the People admitted on appeal was
27   error under state law to give: "If you conclude that the defendant knew he possessed
28   property and you conclude that the property had in fact been recently stolen, you may not

1  convict the defendant of murder based on those facts alone.  However, if you also find that
2  supporting evidence tends to prove his guilt, then you may conclude that the evidence is
3  sufficient to prove he committed murder.  The supporting evidence need only be slight and
4  need not be enough by itself to prove guilt." (RT 731.)

5        Petitioner's defense counsel argued to the jury in closing that the circumstantial
6  evidence compelled an inference which points to innocence because there was no gunshot
7  residue found in the truck or in Combs' pants pockets where Chavez' DNA was found,
8  which would have been expected if either of the defendants had shot the victims and stolen
9  the truck, and that the evidence merely showed, at most, that Petitioner was at the scene
10  near the time of the murders and had been in the Ellis' truck within four days of the
11  murders. (RT 803-13.) Defense counsel also argued that the opinion of the defense expert
12  that Ellis' body had been rolled over minutes or hours after he died allowed for an inference
13  that Chavez came along after the murders, rolled Ellis over, took his keys and stole his
14  truck, which, as with the evidence that Petitioner was merely at the scene at some point,
15  was insufficient to support the murder charges. (RT 814-21.)

16       The prosecutor argued in closing that Petitioner and Chavez were guilty of aiding
17  and abetting premeditated murder, or aiding and abetting a robbery that resulted in the
18  death of the victims, because they waited until Ellis and Combs were the only ones left at
19  the bonfire, going so far as to scare their friends off, including making unwanted sexual
20  overtures to Mary Macy to chase her away when she returned after everyone else was gone,
21  and because it must have taken at least two teenagers working together to kill two young
22  strong sailors in a manner necessitating a struggle which left the usually well-dressed Ellis
23  disheveled and covered in dirt and vegetation. (RT 753-81.) The prosecutor argued that
24  the defendants eventually shot the victims execution-style, took the their wallets and Ellis'
25  keys, left their DNA at the scene, and then stole the truck and were in continuous possession
26  of it for several days as shown by their DNA and fingerprints in the truck and leaving the
27  always immaculate truck filthy. (Id.) As relevant to Claim 3 here, the prosecutor argued
28  that: (1) the victims were serving their country (RT 752, 756), which Petitioner argues was

1  an appeal to the sympathy of the jury; (2) that: "The witnesses are dead.  But just as my
2  heart is beating in my chest, those two men stopped the heartbeats of Keith and Cliff" (RT
3  767), which Petitioner contends was an expression of a personal opinion of guilt; and (3)
4  said: "And I have to comment on the [defense] expert.  How can I not?  You can hire
5  somebody and have them come in here and say anything" (RT 831), which Petitioner
6  argues improperly disparaged the defense expert.  Petitioner also claims the prosecutor
7  argued facts not in evidence when she urged the jurors to speculate that the defendants had
8  a preconceived "plan" to rob the victims because they arrived at the scene "with a loaded
9  gun," that four young Hispanic males "surrounded" the victims, that Combs was shot first
10  and Ellis then tried to escape, that Ellis "fought for his life," and that the crimes required
11  multiple perpetrators.  (RT 757-78, 827, 830.)

12      After deliberating about two days, during which the testimony of Mary Macy and
13  Barbara Behmkhe were read back, the jury found Petitioner and Chavez guilty of two
14  counts of first degree murder, and found they were armed with a firearm during the
15  commission of the murders. (CT 413-24, 474-78.) The jury also found true the two special
16  circumstance allegations that the murders were committed during the commission or
17  attempted commission of robbery, and that both defendants had been convicted of more
18  than one count of first degree murder. (Id.) The defendants were each sentenced to two
19  consecutive terms of life without the possibility of parole plus one year, later reduced to
20  two consecutive terms of 25 years-to-life plus one year. (CT 427, 485.)

21  **III.   DISCUSSION**

22      Petitioner claims his federal constitutional rights were violated because the evidence
23  is insufficient to prove he was guilty of murder (Claim 1) and insufficient to support the
24  special circumstance findings (Claim 2), because the prosecutor committed misconduct in
25  closing argument by appealing to the sympathy of the jury, expressing a personal belief in
26  guilt, arguing facts not in evidence, and denigrating the defense expert (Claim 3), and
27  because the court erred in instructing the jury that Petitioner could be found guilty of
28  murder based on his possession of stolen property plus other slight evidence of guilt (Claim

14

1  4). (FAP at 6-9, 15-30.) Respondent answers that habeas relief is unavailable because the

2  adjudication of the claims by the state court is neither contrary to, nor involves an

3  unreasonable application of, clearly established federal law, and any errors with respect to

4  Claim 3 and 4 are harmless. (Ans. Mem. at 16-35.)

5      Petitioner replies that because the evidence presented at his trial does not establish

6  the elements of murder, aiding and abetting murder, or the special circumstances, the state

7  court adjudication of Claims 1 and 2, on the basis that sufficient evidence supports the jury

8  verdicts, is contrary to, or involves an unreasonable application of, clearly established

9  federal law which requires that every element of a criminal offense, as those elements are

10 defined under state law, must be established beyond a reasonable doubt. (Memorandum

11 of Points and Authorities in Support of First Amended Petition ["FAP Mem."] at 26-39;

12 Traverse at 6-12.) He also argues that the determination by the state court that there was

13 no prosecutorial misconduct and that the instructional error was harmless, is unreasonable,

14 and that those errors are not harmless. (FAP Mem. at 39-43; Traverse at 12-17.)

15     **A.  Standard of Review**

16     In order to obtain federal habeas relief with respect to claims which were adjudicated

17 on their merits in state court, a federal habeas petitioner must demonstrate that the state

18 court adjudication of the claims: "(1) resulted in a decision that was contrary to, or involved

19 an unreasonable application of, clearly established Federal law, as determined by the

20 Supreme Court of the United States; or (2) resulted in a decision that was based on an

21 unreasonable determination of the facts in light of the evidence presented in the State court

22 proceeding." 28 U.S.C.A. § 2254(d) (West 2006). Even if § 2254(d) is satisfied, or does

23 not apply, a petitioner must still show a federal constitutional violation occurred in order

24 to obtain relief. Fry v. Pliler, 551 U.S. 112, 119-22 (2007); Frantz v. Hazey, 533 F.3d 724,

25 735-36 (9th Cir. 2008) (en banc). Furthermore, a petitioner must also show that any

26 constitutional error is not harmless, unless it is of the type included on the Supreme Court's

27 "short, purposely limited roster of structural errors." Gautt v. Lewis, 489 F.3d 993, 1015

28 (9th Cir. 2007), citing Arizona v. Fulminante, 499 U.S. 279, 306 (1991) (recognizing "most

1    constitutional errors can be harmless.") Insufficiency of the evidence claims are not subject
2    to harmless error review. Jackson v. Virginia, 443 U.S. 307, 319 (1979) (requiring habeas
3    relief to be granted if "all rational fact finders would have to conclude that the evidence of
4    guilt fails to establish every element of the crime beyond a reasonable doubt.")

5         A state court's decision may be "contrary to" clearly established Supreme Court
6    precedent (1) "if the state court applies a rule that contradicts the governing law set forth
7    in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially
8    indistinguishable from a decision of [the] Court and nevertheless arrives at a result different
9    from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state
10   court decision may involve an "unreasonable application" of clearly established federal
11   law, "if the state court identifies the correct governing legal rule from this Court's cases
12   but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407.
13   Relief under the "unreasonable application" clause of § 2254(d) is available "if, and only
14   if, it is so obvious that a clearly established rule applies to a given set of facts that there
15   could be no 'fairminded disagreement' on the question." White v. Woodall, 572 U.S. ___,
16   134 S.Ct. 1697, 1706-07 (2014), quoting Harrington v. Richter, 562 U.S. 86, 103 (2011).

17        "[A] federal habeas court may not issue the writ simply because the court concludes
18   in its independent judgment that the relevant state-court decision applied clearly
19   established federal law erroneously or incorrectly. . . . Rather, that application must be
20   objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal
21   quotation marks and citations omitted). In order to satisfy § 2254(d)(2), the petitioner must
22   show that the factual findings upon which the state court's adjudication of his claims rest
23   are objectively unreasonable. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

24        **B.    Claim 1**

25        Petitioner alleges in Claim 1 that there is no evidence in the record of his conduct at
26   any time relevant to the killings, no eyewitness testimony, no identification of him, no
27   evidence connecting him to the only weapon used, no evidence he had a relationship with
28   Chavez, and no evidence of consciousness of guilt. (FAP at 6, 15-22.) Rather, the evidence

1 | against him is a cigarette butt with his DNA found at the scene, which is a party area
2 | frequented by large groups of young people, and his fingerprints and DNA found in and on
3 | the stolen truck. (Id.) He claims that his right to due process under the Fifth and Fourteenth
4 | Amendments was violated because the evidence is insufficient to satisfy the elements, as
5 | defined by California law, of murder, robbery, or aiding and abetting murder or robbery,
6 | but merely establishes he was at some unknown time in the stolen truck and at some
7 | unknown time at the crime scene. (Id.)

8 | Petitioner presented this claim, as a federal constitutional claim, to the state supreme
9 | court in his petition for review. (Lodgment No. 6 at 10-16.) That petition was summarily
10 | denied without citation of authority or a statement of reasoning. (Lodgment No. 7.) The
11 | same claim was also presented to the state appellate court on direct appeal as a federal
12 | constitutional claim. (Lodgment No. 3 at 11-21.) The claim was denied on the merits in a
13 | written opinion affirming the convictions. (Lodgment No. 5.)

14 | There is a presumption that "[w]here there has been one reasoned state judgment
15 | rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the
16 | same claim rest upon the same ground." Ylst v. Nunnemaker, 501 U.S. 797, 803-06 (1991);
17 | see also Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005) ("Before we can apply
18 | [the] standards [of 28 U.S.C. § 2254(d)], we must identify the state court decision that is
19 | appropriate for our review. When more than one state court has adjudicated a claim, we
20 | analyze the last reasoned decision.") The state appellate court first identified the applicable
21 | legal standards under state law regarding sufficiency of the evidence claims. (Lodgment
22 | No. 5, People v. Chavez, et al., No. D061946, slip op. at 12-13.) As discussed below, they
23 | are identical to the controlling federal legal standards, which, as Petitioner correctly
24 | observes, require the existence of sufficient evidence to prove every element of a criminal
25 | offense beyond a reasonable doubt, as those elements are defined by state law. The state
26 | appellate court then identified the elements of first degree murder under the two theories
27 | argued by the prosecution: aiding and abetting the deliberate, premeditated murder of the
28 | victims, and aiding and abetting a robbery that resulted in the death of the victims. (Id. at

16cv0320-AJB (KSC)

13-15, citing People v. Prettyman, 14 Cal.4th 248, 259 (1996) (holding that under California law a person who aids and abets a crime is a principal in the crime, sharing the same guilt as the perpetrator, and that "[a]n aider and abettor is a person who, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.") (internal quotation marks omitted).)

After concluding there was sufficient evidence to convict Chavez and denying his insufficiency of the evidence claim, the state appellate court stated:

> Elias likewise contends there is insufficient evidence to support his conviction. Elias argues that the cigarette butt found at the scene and the forensic evidence recovered from Ellis's truck do not lead to the reasonable inference that Elias aided and abetted the robbery. Elias's argument relies, in large part, on a misstatement of the applicable standard of review. Elias argues that his convictions cannot stand if the evidence is as consistent with guilt as with another rational conclusion that points to innocence. (See *People v. Flores* (1943) 58 Cal.App.2d 764, 769 ("it is elementary law that circumstances relied upon to establish the guilt of one accused of crime must be consistent with that hypothesis and inconsistent with any other rational conclusion").) However, this principle is not a correct statement of law to be applied on appeal. "'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence (citations), it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'"'" (*People v. Jones* (2013) 57 Cal.4th 899, 961.) "Nor may a conviction be set aside because evidence is susceptible of two reasonable inferences, one looking to guilt and another to innocence." (*People v. Lewis, supra,* 222 Cal.App.2d at p. 149.)
>
> Viewing the entire record in the light most favorable to the prosecution, and drawing all reasonable inferences from the evidence in support of the conviction, as we must, we conclude the substantial evidence supports Elias's convictions. Our Supreme Court's opinion in *People v. Bean* (1988) 46 Cal.3d 919 (*Bean*) is instructive. In that case, the defendant challenged the

1   sufficiency of the evidence supporting his convictions for two discrete
2   murders.  The evidence tying the defendant to one of the murders bears some
    similarity to the evidence here: "A pair of sunglasses bearing what the
3   People's experts identified as defendant's fingerprints were found next to the
4   body of Eileen Fox, and the defendant admitted owning a pair of similar
    sunglasses.  In addition there was evidence that defendant had been seen,
5   possibly observing the house, in the past; that he was living nearby with his
6   sister; and that he was familiar with the shortcut from the location at which
    the automobile, purse, and wallet were discarded to the Florin Meadows
7   apartments." (*Id.* at pp. 933-934, fns. omitted.)

8       With other evidence of the victim's condition, the Supreme Court found
9   sufficient evidence to support the defendant's first degree murder conviction
    and "the jury's conclusion that the murder was committed in the perpetration
10  of a burglary and a robbery." (*Bean*, *supra*, 46 Cal.3d at p. 934.)

11
12      The evidentiary similarity between *Bean* and the instant case supports
    the conclusion Elias participated in the killings and robbery.  Here, just as in
13  *Bean*, forensic evidence on a small, portable object places Elias at the scene
14  of the crime.  (See *Bean*, *supra*, 46 Cal.3d at p. 933.)  While Elias was not
15  specifically identified by any witness as one of Chavez's companions that
    night, it is reasonable to infer that he was there based on the cigarette butt and
16  the forensic evidence recovered from Ellis's truck.  Elias's fingerprints were
17  recovered from multiple interior and exterior surfaces on the truck, as were
18  Chavez's, and DNA from both Chavez and Elias was recovered from the same
    cup inside the truck.  Elias claims that no evidence of the relationship between
19  Chavez and Elias was introduced, but the forensic evidence recovered from
20  the truck demonstrates that they were known to each other.  Moreover, the
    evidence tying Elias to the fruits of the robbery is arguably stronger than the
21  evidence considered sufficient in *Bean*.  Elias's fingerprints and DNA were
22  recovered from Ellis's truck, whereas the evidence in *Bean* showed only that
23  the defendant was familiar with a route near where certain stolen goods were
    discarded. (See *Id.* at p. 934.) Elias's attempt to distinguish *Bean* on the facts
24  is unpersuasive, as the evidence here is in fact more incriminating than the
25  evidence considered by the Supreme Court in *Bean*.

26
27      Although the jury convicted the defendant in *Bean* of first degree
    murder as the perpetrator of the robbery and murder, the reasonable inferences
28  drawn in that case from the evidence apply equally to the aiding and abetting

19

theory of liability pursued by the prosecution here.  Indeed, the purpose of aiding and abetting liability is to "obviate() the necessity to decide who was the aider and abettor and who the direct perpetrator or to what extent each played which role." (*People v. McCoy, supra*, 25 Cal.4th at p. 1120; see *People v. Morante* (1999) 20 Cal.4th 403, 433 ("the doctrine . . . "'snares all who intentionally contribute to the accomplishment of a crime in the net of criminal liability defined by the crime, even though the actor does not personally engage in all of the elements of the crime"''").)

"Factors relevant to a determination of whether defendant was guilty of aiding and abetting include: presence at the scene of the crime, companionship, and conduct before and after the offense." (*People v. Singleton* (1987) 196 Cal.App.3d 488, 492.)  Considering these factors, and viewed as a whole, the evidence points to Elias's complicity and supports his conviction.  Although Elias contends there is "no evidence" of his actions or intent that night, it is reasonable to infer that Elias was present with Chavez at the Anchors and Spurs bonfires prior to the robbery and murders, that he waited with Chavez until Combs and Ellis were alone, that he assisted Chavez and potentially others in robbing and murdering Combs and Ellis (or was the perpetrator himself), and that he then left the scene with Chavez in Ellis's stolen truck.  These inferences arise out of the consistent testimony of witnesses that Chavez was present at the bonfires with one or more companions, separate DNA recovered at the crime scene which showed that Chavez and Elias had been present, and the DNA and fingerprints found in Ellis's truck, which showed that both defendants were occupants of the truck.

Elias's culpability is reinforced by a large quantum of evidence which shows that at least two perpetrators were needed to accomplish the robbery and double murder.  Witnesses testified that Ellis parked his truck with its rear facing the bonfire, where his body and Combs's body were later found. Although the bodies of Ellis and Combs were 16 feet apart, their location, their parallel positioning and the location of the items removed from the truck and dumped on the ground support the conclusion that Ellis and Combs were killed on either side of the truck.  Combs's body was found on what would have been the passenger side of Ellis's new truck; Ellis's body, parallel to Combs's body, was found on what would have been the driver's side of the truck, the same side where the accessory items from the truck and the brochure

were found after being removed from the truck and dropped on the ground. The condition of Ellis's body supports an inference he had been in a fight before he was killed. His face and neck area had contusions. His leg had been injured. His clothing was uncharacteristically disheveled, and there was plant debris on his face. Given the distance between the bodies, the likelihood the truck was between them and the fact one of the victims engaged in a physical fight before being killed, it is difficult to conclude that only one person was able to subdue, fight and kill both victims.

Although a mere spectator may not be liable for aiding and abetting, and mere knowledge of a perpetrator's unlawful purpose is insufficient, in light of all the circumstantial evidence in the record, Elias's contention that his role might have been so limited is speculation. (See *People v. Nguyen, supra*, 21 Cal.App.4th at pp. 529-530.) As the court in *People v. Allen* (1985) 165 Cal.App.3d 616 stated on an analogous record: "Under these circumstances, it is immaterial that the evidence was silent as to which defendant actually shot (the victim); it is virtually inconceivable that the one who did *not* shoot him did not aid and abet the shooting." (*Id.* at p. 626.)

Elias contends that this case is similar to *People v. Trevino* (1985) 39 Cal.3d 667, in which the Supreme Court concluded the evidence was insufficient to support a defendant's conviction of first degree murder. We disagree. In that case, an eyewitness offered potentially exculpatory testimony tending to show that the defendant was not one of the individuals she had seen at the scene of the crime. (*Id.* at p. 696.) Although the defendant's fingerprint was found in the house where the robbery and murder occurred, the defendant had been a guest there in the past. (*Id.* at p. 697.) The Supreme Court explained, "The highly speculative and equivocal identification testimony and the solitary fingerprint of some unknown vintage do not constitute evidence which is 'reasonable, credible and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' (Citation.)" (*Ibid.*) Here, the evidence tying Elias to the crime is more robust, including, in particular, the recently smoked Marlborough [sic] cigarette butt found between the victim's bodies very shortly after they were killed and powerful evidence of Elias's presence with Chavez in Ellis's stolen truck. Importantly, unlike the record in *People v. Trevino*, here there is no arguably exculpatory evidence in the record.

1
2
3
4
5
6

> We likewise conclude that the evidence in the record here is more compelling than the evidence found insufficient in the various authorities cited by Elias in his briefing. (See *People v. Flores, supra*, 58 Cal.App.2d at pp. 766-768 (evidence consisted of defendant's fingerprints on rearview mirror of stolen car); *Birt v. Superior Court* (1973) 34 Cal.App.3d 934, 938 (evidence consisted of defendant's fingerprint on cigarette lighter in rental van used in robbery).) Substantial evidence supports Elias's convictions.

7   (Lodgment No. 5, People v. Chavez, et al., No. D061946, slip op. at 16-22.)

8   "[T]he Due Process Clause protects the accused against conviction except upon
9   proof beyond a reasonable doubt of every fact necessary to constitute the crime with which
10  he is charged." In re Winship, 397 U.S. 358, 364 (1970). The Fourteenth Amendment's
11  Due Process Clause is violated, and an applicant is entitled to federal habeas corpus relief,
12  "if it is found that upon the record evidence adduced at the trial no rational trier of fact
13  could have found proof of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 324.
14  Federal habeas courts must analyze Jackson claims "with explicit reference to the
15  substantive elements of the criminal offense as defined by state law." Id. at 324 n.16.

16  Although the state appellate court did not specifically cite to Jackson or any other
17  federal law, the state law cases cited by and relied on by the appellate court acknowledge
18  and adopt the Jackson standard. (Lodgment No. 5, People v. Chavez, et al., No. D061946,
19  slip op. at 12-13.) Thus, although the appellate court here did not cite to Jackson, "such a
20  citation is not required 'so long as neither the reasoning nor the result of the state-court
21  decision contradicts' Supreme Court precedent." Juan H. v. Allen, 408 F.3d 1262, 1274
22  n.12 (9th Cir. 2005), quoting Early v. Packer, 537 U.S. 3, 8 (2002). Accordingly, this Court
23  will look through the silent denial by the state supreme court and apply the provisions of
24  28 U.S.C. § 2254(d) to the appellate court opinion. Ylst, 501 U.S. at 803-06. The Court
25  must "apply the standards of Jackson with an additional layer of deference," and can only
26  grant habeas relief if the state court's decision was objectively unreasonable. Juan H., 408
27  F.3d at 1274-75 (holding that habeas relief is only available if the state court decision
28  reflects "an unreasonable application of Jackson and Winship to the facts of this case.")

16cv0320-AJB (KSC)

1    Petitioner argues that he can overcome these levels and layers of deference because
2  the state appellate court clearly erred in finding that the evidence at trial established the
3  elements of the offenses under California law. (FAP Mem. at 28-33.)  In particular, he
4  contends there was no evidence he knew that Chavez or anyone else planned to commit
5  murder or robbery, and no evidence that he affirmatively aided, encouraged or facilitated
6  murder or robbery. (Id.) He contends the evidence merely established he was in the stolen
7  truck within four days of the murders and at the crime scene at some point. (Id.)

8    The state court correctly found that the jury could have drawn a reasonable inference
9  from the evidence that at least two people were required to kill and rob the two victims.
10  That finding is supported by evidence that the usually well-dressed Ellis was found with
11  his shirt untucked and his belt undone, with dirt and vegetation stuck to his face and body,
12  and appearing as if someone has stepped on him, from which the jury could draw a
13  reasonable inference that he put up a fight.  Evidence showed that Ellis was shot in the
14  chest and found lying on the ground by the driver's side of where his truck was last seen,
15  and that Combs was shot in the back from close range and a shell casing was found under
16  his body near where the passenger side of the truck would have been, which supported an
17  inference that Combs was shot in the back as he was standing near the passenger door with
18  a gun at his back.  The jury could have drawn a reasonable inference that Combs was shot
19  just before or while someone else struggled with Ellis near the driver's door (perhaps
20  Chavez since a bandage with his DNA was found in Ellis' truck and he was found driving
21  the truck), and that the person who shot Combs in the back near the passenger side (perhaps
22  Petitioner because his fingerprints were found on the passenger side of the truck), then
23  came around to the driver's side in order to assist the person struggling with Ellis and shot
24  Ellis. The testimony of the medical expert that the two bullet wounds in Combs' head were
25  fired from a few feet away, whereas the bullet wound to his back was fired very near his
26  body, that he was not wearing his hat when he was shot in the head, and lived a short time
27  after being shot, coupled with evidence that he was lying on a shell casing, allowed a
28  reasonable inference to be drawn that Combs was shot while someone was holding a gun

1   at his back, he fell down, which caused his hat to fall off, landed on top of the shell casing,

2   and while lying on the ground was shot twice in the head execution-style to ensure he was

3   dead.  The evidence that Ellis could have lived for a short time after the shots to his chest

4   and temple, and did live for a short time after being shot, but would have died instantly

5   from the shot to the back of his head, and had been rolled over, supports an inference that

6   he was shot in the chest, fell down, shot in the head execution-style to ensure he was dead,

7   and was then rolled over and had his keys taken.  Thus, it was objectively reasonable for

8   the state appellate court to find that the evidence supported an inference that at least two

9   people were involved in the crimes.

10   The appellate court also reasonably found that evidence was presented from which

11   the jury could reasonably infer that Chavez and Petitioner were those two people.  That

12   evidence consisted of the numerous eyewitness identifications of Chavez as one of a group

13   of several young Hispanic males who were acting in an aggressive manner threatening or

14   chasing away any remaining Anchors and Spurs people from the area around 5:00 a.m., a

15   time when only Ellis and Combs remained from the Anchors and Spurs crowd, and the

16   most likely time of death.  Additional evidence supporting Chavez' participation was his

17   DNA in Combs' pocket, from which it is reasonable to presume Chavez took Combs'

18   wallet, as well as Chavez' DNA and fingerprints found inside and outside the truck,

19   primarily in and around the driver's side, from which it is reasonable to presume he drove

20   off in Ellis' truck contemporaneously with the murders, particularly since he was stopped

21   while driving the truck a few days later in possession of the truck's keys, and the truck's

22   ignition and locks had not been tampered with.  Evidence that Petitioner was Chavez'

23   companion includes the eyewitness testimony that Chavez was with several other teenage

24   Hispanic males, (Petitioner was at the time of the crimes a teenaged Hispanic male), along

25   with Petitioner's DNA found on a recently discarded cigarette butt collected from between

26   the two bodies, near where items taken from a white box from inside the truck were

27   scattered on the ground, as well as his DNA and fingerprints which were found in and

28   around Ellis' truck.

1       Petitioner contends his DNA on the recently smoked cigarette butt, even assuming
2  it places him at the scene around the time of death, or his DNA and fingerprints in the
3  stolen truck, does not permit a reasonable inference that he acted with Chavez during the
4  murders, or that he shared Chavez' intent to kill or rob the victims.  However, once a state
5  court fact finder has found a defendant guilty, federal habeas courts must consider the
6  evidence "in the light most favorable to the prosecution."  Jackson, 443 U.S. at 319.  It was
7  reasonable and rational for the jury to draw an inference that the victims were murdered
8  during the course of a robbery.  That inference was supported by the evidence that the
9  victims' wallets were missing, that Ellis had been rolled over after he was shot, and his
10 truck was driven away with its keys rather than having its locks and ignition tampered with.
11 The jury was able to draw a rational inference that Chavez participated in the robbery and
12 murders, as several eyewitnesses testified that they saw Chavez at the scene around the
13 time of the murders chasing potential witnesses away, and his DNA was found in one
14 victim's pocket and his DNA and fingerprints found in the other victim's truck.  The jury
15 could draw a reasonable inference that someone acted with the teenaged Chavez because
16 the evidence showed that the victims were two young sailors, one of whom was likely
17 standing with a gun to his back when shot next to the passenger door of the truck, while
18 the other, the owner of the truck, engaged in a struggle near the driver's side of the truck.
19 Finally, the jury could draw a reasonable inference that Petitioner was the person who
20 assisted Chavez from Petitioner's DNA found on a cigarette butt recently discarded
21 between the two dead bodies, near where Ellis' truck was last seen parked, and evidence
22 that his and Chavez' DNA and fingerprints were found in Ellis' truck when it was being
23 driven by Chavez several days after it had been stolen during the murders.

24      In addition to that strong circumstantial evidence that Petitioner was one of the group
25 of young Hispanic males at the scene around the time of the murders, evidence that the
26 keys were with the truck when Chavez was stopped, and that the locks and ignition were
27 undamaged, supports a reasonable inference that the truck was stolen contemporaneously
28 with the murder of its owner.  Evidence that numerous fingerprints of Chavez were found

1  in and around the driver's side of the truck, and numerous fingerprints of Petitioner were

2  found in and around the passenger side of the truck, as well as their DNA inside the truck,

3  supports a reasonable inference that they jointly took the truck at the time of the murders

4  and shared it for four days, which supports an inference they jointly shared the spoils of

5  the robbery, and thus jointly participated in the murders and robbery.

6        Accordingly, sufficient evidence was presented from which a reasonable jury could

7  infer that Petitioner had knowledge of the unlawful purpose of the person who robbed and

8  murdered the victims, or was that person, that he had or shared the intent or purpose of

9  committing, encouraging, or facilitating those crimes, or that he advised, promoted,

10  encouraged or instigated the commission of the crimes.  Thus, the finding by the jury that

11  the elements of the crimes, as defined by state law, had been proven beyond a reasonable

12  doubt, does not "fall below the threshold of bare rationality." Coleman v. Johnson, 566

13  U.S. 650, ___, 132 S.Ct. 2060, 2065 (2012) (per curiam) ("The jury in this case was

14  convinced, and the only question under Jackson is whether that finding was so

15  insupportable as to fall below the threshold of bare rationality."); see also Richter, 562 U.S.

16  at 103 (holding that federal habeas relief functions as a "guard against extreme

17  malfunctions in the state criminal justice systems," and not simply as a means of error

18  correction), quoting Jackson, 443 U.S. at 332 n.5.  It is also clear that Petitioner has failed

19  to show that the factual findings upon which the state court's adjudication of his claims

20  rest are objectively unreasonable. Miller-El, 537 U.S. at 340.  The Court finds that federal

21  habeas relief is not available as to Claim 1 because Petitioner has failed to demonstrate that

22  the state court adjudication of the claim is contrary to, or involves an unreasonable

23  application of, clearly established federal law, or is based on an unreasonable determination

24  of the facts, and the Court recommends denying habeas relief as to Claim 1.

25        **C.     Claim 2**

26        Petitioner alleges in Claim 2 that there is insufficient evidence to support the special

27  circumstance allegation findings for "similar reasons" presented in support of Claim 1.

28  (FAP at 7, 22-23.)  He contends there is insufficient evidence that: (1) he was a major

1  participant in the robbery, or that he acted with intent to kill or reckless disregard for human

2  life, as required for the first special circumstance of murder during the course of robbery;

3  and (2) there was insufficient evidence that he acted with the intent to kill as required for

4  the second special circumstance of multiple murder. (Id.)

5      Respondent answers that Petitioner has not shown that the denial of this claim by the

6  state court, on the basis that there is sufficient evidence in the record to support a finding

7  of intent to kill, is contrary to, or involves an unreasonable application of, clearly

8  established federal law. (Ans. Mem. at 14-24.) Petitioner replies that there is no evidence

9  he knew any member of his group was armed, no evidence he killed the victims to prevent

10 them from identifying him as the state appellate court found, and no evidence he was the

11 shooter or shared the shooter's intent. (Pet. Mem. at 34-35.)

12     Petitioner presented this claim as a federal claim to the state courts in the same

13 manner as Claim 1. (Lodgment No. 3-7.) For the same reasons set forth above with respect

14 to Claim 1, the court will look through the silent denial of the claim by the state supreme

15 court and apply the provisions of 28 U.S.C. § 2254(d) to the appellate court opinion. Ylst,

16 501 U.S. at 803-06. The appellate court stated:

17         Here, substantial evidence supports the jury's finding that Chavez and
           Elias intended to kill Combs and Ellis. Chavez and Elias went to an isolated
18         location, either armed themselves or with armed accomplices, and waited for
           Combs and Ellis to be left alone as the Anchors and Spurs party wound down.
19         Combs and Ellis were young Navy men who were capable of resisting robbery
20         by a group of teenagers. It is reasonable to infer that Chavez and Elias knew
           that their group was armed and that they intended to use deadly force against
21         Combs and Ellis in order to rob them. Once Chavez and Elias confronted
22         Combs and Ellis, it is likely that Chavez and Elias were concerned that Combs
           and Ellis would identify them and either killed the victims themselves or
23         intended for their accomplices to do so. "In light of this evidence, a rational
24         jury could conclude beyond a reasonable doubt defendants(s) intended to kill
           the victims in order to prevent them from identifying (them)." (See Cain,
25         supra, 10 Cal.4th at p. 40.)
26
           Moreover, the location and condition of the bodies, including the fresh
27         abrasion found on Ellis, provide a reasonable basis to infer that Chavez, Elias,
28         and their accomplices collectively restrained and subdued Combs and Ellis in

order to kill them. When a witness returned to the bonfire to retrieve her jacket and interrupted them, either shortly before or after they killed Combs and Ellis, Chavez made sexual remarks to the witness to scare her off. After the killings, Chavez went through Combs's pockets for valuables, someone turned Ellis's body over, and Chavez (likely with Elias) drove away in Ellis's truck. Viewing the record as a whole, we conclude that substantial evidence supports the jury's finding that Chavez and Elias intended to kill Combs and Ellis.

Elias argues that "(t)here was no evidence of planning, no evidence that the participants knew the shooter was armed, and no evidence of what occurred during the shooting or what Elias did during the shooting." However, "'(c)ircumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.' (Citation.)" (*Bean, supra*, 46 Cal.3d at p. 933.) On appeal, we "presume() in support of the judgment the existence of every fact the trier could reasonable deduce from the evidence." (*Kraft, supra*, 23 Cal.4th at p. 1053.) We do not examine the record for direct evidence on specific issues. Rather, we consider whether the evidence as a whole would be sufficient for a reasonable jury to find intent to kill beyond a reasonable doubt. "Even if we might have made contrary factual findings or drawn different inferences, we are not permitted to reverse the judgment if the circumstances reasonably justify those found by the jury. It is the jury, not the appellate court, that must be convinced beyond a reasonable doubt. Our task and responsibility is to determine whether that finding is supported by substantial evidence." (*Perez, supra*, 2 Cal.4th at p. 1126.) Here, as we have discussed, we conclude that the jury's finding is supported by substantial evidence.

Chavez's argument relies on extensive quotations from the prosecution's closing argument. Chavez contends that the prosecutor's theory of intent was speculative and unsupported. "It is elementary, however, that the prosecutor's argument is not evidence and the theories suggested are not the exclusive theories that may be considered by the jury." (*Perez, supra*, 2 Cal.4th at p. 1126.) Regardless of the prosecution's stated theory of intent in closing arguments, we conclude that the evidence supports the jury's finding of intent to kill here.

The jury's inference that Chavez and Elias intended to kill Combs and Ellis, where the evidence shows that Chavez and Elias waited for Combs and Ellis to be alone, confronted them in an armed group in the early morning hours at an isolated location, and overpowered them in circumstances showing that multiple individuals were involved, resulting in their violent and brutal deaths, is based on neither speculation nor guess work. It is the rational

1  product of reason applied to the direct forensic and eyewitness evidence
2  admitted by the trial court. Substantial evidence supports the jury's multiple
3  murder finding.

4  (Lodgment No. 5, <u>People v. Chavez, et al.</u>, No. D061946, slip op. at 23-25.)

5      Sufficient evidence was produced at trial to support a reasonable inference that
6  Petitioner acted with intent to kill. As set forth above in Claim 1, reasonable inferences
7  could be drawn that both victims were shot in the head after they had been shot in the back
8  and chest respectively and were lying on the ground. That circumstance shows an obvious
9  intent to kill, and it is not objectively unreasonable for the appellate court to also find that
10  evidence consistent with an intent to ensure the witnesses could not identify the
11  perpetrators.

12      Additional evidence supports the finding that Petitioner had the intent to kill or
13  shared Chavez' intent to kill. A reasonable inference could be drawn that at least two
14  teenagers needed to help each other to overcome the two young, fit victims. In addition,
15  they died on opposite sides of the truck, also indicating more than one perpetrator. The
16  jury could reasonably find that the killers came from a group of several young Hispanic
17  teenagers who were seen chasing witnesses away from the scene around the most likely
18  time of death, one of whom was identified by several witnesses as Chavez, indicating
19  planning and cooperation. Thus, the evidence supported a reasonable inference that by
20  shooting the victims in the chest and back, and then twice each in the head after they had
21  been subdued, whoever killed or helped kill the victims acted with an intent to kill, that
22  one of those persons was Chavez, and that someone helped Chavez.

23      There is sufficient evidence in the record for the jury to draw a reasonable inference
24  that Petitioner was the person who killed the victims or assisted Chavez in killing them.
25  That evidence consisted of Petitioner's DNA at the scene on a cigarette butt recently
26  discarded between the two bodies near where items from inside the truck were scattered,
27  from which the jury could draw a reasonable inference that Petitioner was a member of the
28  group of young Hispanic males seen in the area, and was present during the robbery and

1  murders.  Evidence that Petitioner's fingerprints and DNA were found in and on the truck,

2  mostly in and around the passenger side, when it was stopped four days later with Chavez

3  driving, which, along with evidence that the truck was stolen contemporaneously with the

4  murders and driven away by Chavez, allowed the jury to draw a reasonable inference that

5  Petitioner and Chavez were the people who stole the truck after murdering the victims

6  execution style, and shared the spoils of the robbery.  The finding by the jury that the intent

7  to kill elements of the two special circumstance allegations had been proven beyond a

8  reasonable doubt does not "fall below the threshold of bare rationality." Johnson, 132 S.Ct.

9  at 2065 ("The jury in this case was convinced, and the only question under Jackson is

10 whether that finding was so insupportable as to fall below the threshold of bare

11 rationality."); see also Richter, 562 U.S. at 103 (holding that federal habeas relief functions

12 as a "guard against extreme malfunctions in the state criminal justice systems," and not

13 simply as a means of error correction.), quoting Jackson, 443 U.S. at 332 n.5.

14     The state court adjudication of Claim 2, on the basis that sufficient evidence

15 supported the two special circumstance allegations, is neither contrary to, nor an

16 unreasonable application of, clearly established federal law. Andrade, 538 U.S. at 75-76;

17 Williams, 529 U.S. at 405-07; see also Richter, 562 U.S. at 103 ("As a condition for

18 obtaining habeas relief from a federal court, a state prisoner must show that the state court's

19 ruling on the claim being presented in federal court was so lacking in justification that there

20 was an error well understood and comprehended in existing law beyond any possibility for

21 fairminded disagreement.")  The Court also finds that the state court adjudication was not

22 based on an unreasonable determination of the facts. Miller-El, 537 U.S. at 340. The Court

23 therefore recommends habeas relief be denied as to Claim 2.

24     **D.    Claim 3**

25     Petitioner alleges in his third claim that the prosecutor committed misconduct in

26 closing argument by appealing to the sympathy of the jury, expressing a personal belief in

27 guilt, arguing facts not in evidence, and denigrating the defense expert.  (FAP at 8.)

28 Respondent answers that the adjudication of this claim by the state court, on the basis that

1  the prosecutor's comments were not improper, is neither contrary to, nor involves an

2  unreasonable application of, clearly established federal law.  (Ans. Mem. at 18-23.)

3  Respondent also argues that any error is harmless because the prosecutor's remarks were

4  insignificant in light of the evidence of Petitioner's guilt.  (Id. at 23-24.)

5      Petitioner presented this claim to the state supreme court in support of his federal

6  due process violation.  (Lodgment No. 6 at 18-21, citing Donnelly v. DeChristoforo, 416

7  U.S. 637, 643 (1974) (holding that misconduct by a prosecutor in a state criminal trial

8  violates the right to due process guaranteed by the Fourteenth Amendment only where the

9  remark "by itself so infected the trial with unfairness as to make the resulting conviction a

10  denial of due process.") and Darden v. Wainwright, 477 U.S. 168, 182-83 (1986) (holding

11  that a federal constitutional error does not arise unless the prosecutor's argument rendered

12  the trial fundamentally unfair).)  The state supreme court summarily denied the claim

13  without citation of authority or a statement of reasoning.  (Lodgment No. 7.)

14      The claim was also presented to the state appellate court on direct appeal.

15  (Lodgment No. 3 at 24-31.)  However, Petitioner did not claim a violation of federal due

16  process in the state appellate court, but provided citations to state cases only, although he

17  did argue that if the claim was precluded by a failure to object at trial such preclusion was

18  due to constitutionally ineffective assistance of counsel.  (Id. at 32-33.)  The claim was

19  denied on the merits in a written opinion affirming the convictions, without reference to

20  federal constitutional due process, and with an aside that because there was no misconduct

21  there was no need to determine whether any failure to object constituted constitutionally

22  ineffective assistance of counsel.  (Lodgment No. 5.)

23      The last decision with respect to Petitioner's federal due process claim is the silent

24  denial by the state supreme court.  This Court must presume it was an adjudication on the

25  merits of the federal constitutional claims presented.  See Richter, 562 U.S. at 99 ("When

26  a federal claim has been presented to a state court and the state court has denied relief, it

27  may be presumed that the state court adjudicated the claim on the merits in the absence of

28  any indication or state-law procedural principles to the contrary.")  This Court "must

1    determine what arguments or theories . . . could have supported the state court's decision;
2    and then it must ask whether it is possible fairminded jurists could disagree that those
3    arguments or theories are inconsistent with the holding in a prior decision of" the Supreme
4    Court. Id. at 102.  However, the reasoning set forth by the state appellate court, if it is
5    relevant to the constitutional issue, must be part of a federal habeas court's consideration.
6    Frantz, 533 F.3d at 734-38; Barker, 423 F.3d at 1093.

7         Petitioner first claims the prosecutor argued facts not in evidence when she urged
8    the jurors to speculate that the defendants had a preconceived "plan" to rob the victims
9    because they arrived at the scene "with a loaded gun," that four Hispanics "surrounded"
10   the victims, that Combs was shot first and Ellis then tried to escape, that Ellis "fought for
11   his life," that the crimes required multiple perpetrators, and that no one tried to prevent the
12   shooting. (FAP at 8, 25-26.)  The appellate court stated:

13        "(S)tatements of facts not in evidence by the prosecuting attorney in
14        his argument to the jury constitutes misconduct." (People v. Kirkes (1952) 39
          Cal.2d 719, 724.)  "Although prosecutors have wide latitude to draw
15        inferences from the evidence presented at trial, mischaracterizing the evidence
          is misconduct." (People v. Hill (1998) 17 Cal.4th 800, 823.)
16

17        The first series of alleged misstatements identified by Elias reflect the
18        prosecutor's argument that Ellis was shot after Combs, that Ellis tried to
          escape, and that Ellis fought with multiple perpetrators and was restrained.
19        Elias points out correctly that there was no direct evidence or expert testimony
          regarding the sequence of shots or signs of struggle. The scope of permissible
20        argument, however, is broader. "It is settled that a prosecutor is given wide
21        latitude during argument.  The argument may be vigorous as long as it
          amounts to fair comment on the evidence, which can include reasonable
22        inferences, or deductions to be drawn therefrom. (Citations.)" (People v.
23        Wharton (1991) 53 Cal.3d 522, 567.)  The prosecutor's comments in this
          instance were reasonable inferences from the evidence admitted. Ellis had
24        several abrasions on his neck and leg, one of which was fresh.  His belt was
25        undone, and his clothes were uncharacteristically disheveled.  From these
          facts, the prosecutor could reasonable infer that Ellis had been involved in a
26        struggle, tried to flee, and was restrained. Finally, eyewitnesses testified that
27        up to four people were with Chavez that night, so it is reasonable to infer that
          they were also involved in the robbery and murder.  Though Elias argues that
28        other inferences are also possible, the prosecution may argue its own

16cv0320-AJB (KSC)

1   interpretation of the evidence so long as it is reasonable. (*People v.*
2   *Cunningham* (2001) 25 Cal.4th 926, 1026.)

3       The second series of alleged misstatements identified by Elias reflect
4   the prosecutor's argument that Elias planned the robbery and that Elias was
    armed. Again, we find no misconduct. The evidence showed that Chavez and
5   his group were at the Palms for some time prior to the robbery. While there
6   was no direct evidence of a plan, the presence of Chavez and his group at the
    bonfires prior to the robbery, the fact that their group was armed, and the
7   robbery itself give rise to the reasonable inference that the robbery was
8   planned rather than occurring spontaneously. While Elias contends that the
    prosecution claimed he was personally armed, the prosecutor's argument was
9   that "they took a loaded gun with them" to the Palms area. She did not
10  specifically identify Elias. Since Combs and Ellis were shot, and all
    reasonable inferences point to a group consisting of at least Chavez and Elias
11  as the shooter or shooters, the prosecutor's statement was a proper comment
12  on the record. (*People v. Wharton, supra*, 53 Cal.3d at p. 567.)

13      We can discern no misconduct in the alleged misstatements identified
14  by Elias. In light of our conclusion, we need not consider whether Elias
    forfeited his claims of error on appeal by failing to object or whether Elias's
15  counsel was ineffective by failing to make such objection.

16  (Lodgment No. 5, People v. Chavez, et al., No. D061946, slip op. at 33-35.)

17      Clearly established federal law provides that prosecutorial misconduct, in order to
18  constitute a federal due process violation, must be "'of sufficient significance to result in
19  the denial of the defendant's right to a fair trial.'" Greer v. Miller, 483 U.S. 756, 765
20  (1987), quoting United States v. Bagley, 473 U.S. 667, 676 (1985). The misconduct must
21  be reviewed in the context of the entire trial. DeChristoforo, 416 U.S. at 643; see also
22  Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir. 1996) ("Improper argument does not, per
23  se, violate a defendant's constitutional rights."); Williams v. Borg, 139 F.3d 737, 744 (9th
24  Cir. 1998) ("The relevant question is whether the prosecutor's comments so infected the
25  trial with unfairness as to make the resulting conviction a denial of due process.")

26      The record supports the finding by the state appellate court that the prosecutor did
27  not ask the jury to draw unreasonable inferences from facts not in evidence when she
28  argued the crimes were planned, that the defendants arrived with a loaded gun, that the

1  victims were surrounded, that Combs was shot first and Ellis then tried to escape, that Ellis

2  fought for his life, and that the crimes required multiple perpetrators. As discussed in

3  Claim 1, a reasonable inference of planning could be drawn from the evidence that a group

4  of teenage Hispanic males, like Petitioner, and which included Chavez, were either waiting

5  for the victims' friends to leave the area or chasing them away around the time of the

6  crimes, and that the crimes occurred after everyone except the victims and the young

7  Hispanic males left the area. A reasonable inference could be drawn that more than one

8  teenager was required to rob and kill two young men who were capable of putting up a

9  fight, and that one perpetrator shot Combs in the back on the passenger side of the truck

10  while Ellis put up a struggle with another perpetrator on the driver's side. That evidence,

11  coupled with the fact that the victims were shot in an isolated area, supports the inference

12  argued by the prosecutor that the defendants brought a loaded gun to the area, planned the

13  crime, and more than one defendant participated. With respect to Petitioner's challenge to

14  the prosecutor's statement that "no one tried to prevent the shootings" (FAP at 8), Petitioner

15  has never provided a record citation for that statement, either here (id.), or in the state

16  supreme (Lodgment No. 6 at 18-20) or appellate (Lodgment No. 3 at 24-28) courts, and it

17  does not appear in the record.

18      The state supreme court's silent denial, as informed by the appellate court's findings

19  and reasoning, of the aspect of Claim 3 alleging that the prosecutor committed misconduct

20  when she argued facts not in evidence, is not based on an unreasonable determination of

21  the facts, and is neither contrary to, nor an unreasonable application of, clearly established

22  federal law which provides that the alleged misconduct must be "'of sufficient significance

23  to result in the denial of the defendant's right to a fair trial.'" Greer, 483 U.S. at 765,

24  quoting Bagley, 473 U.S. at 676; Miller-El, 537 U.S. at 340.

25      With respect to Petitioner's claim that the prosecutor committed misconduct by

26  appealing to the sympathy of the jury, the appellate court stated:

27          In her closing argument, the prosecutor described Combs and Ellis and
           "young men who had come to San Diego to serve their country." She also
28          referred to Ellis's college pamphlet, arguing that "that's the kind of guy he

1   (was), trying to better himself, serve his country – (¶) . . . (¶) – go to college."
2   The trial court overruled defense counsel's objection to the latter comment.
3   No objection was made to the former. Elias contends on appeal that the
4   prosecutor's statement that Ellis and Combs "serve(d) their country" when
5   they were killed was an improper appeal to the jury's sympathy. (See *People*
6   *v. Kipp* (2001) 26 Cal. 4th 1100, 1130.) In *Kipp*, the prosecutor argued to the
7   jury, during the guilt phase of a capital trial, that the jury should "'think for a
8   moment about what (murder) means. A living, breathing human being had all
9   of that taken away.'" (*Id.* at p. 1129.) The court held that "(t)he prosecutor's
10   argument, inviting the jury to reflect on all that the victim had lost through her
11   death, was an appeal for sympathy for the victim, and therefore it was
12   improper . . . ." (*Id.* at p. 1130.)

Here, the prosecutor's statement that Combs and Ellis "serve(d) their
country" does not invite such an emotional response from the jury. A
prosecutor is not "required to discuss his view of the case in clinical or
detached detail." (*People v. Panah* (2005) 35 Cal.4th 395, 463.) Such a mild
comment on the victims' military service, which was relevant to a number of
issues in the case, does not improperly appeal to the jury's sympathy and was
not misconduct.

15   (Lodgment No. 5, <u>People v. Chavez, et al.</u>, No. D061946, slip op. at 35-36.)

16       The state court correctly observed that the fact that the victims were serving in the

17   military was relevant to the issue of robbery, as several witnesses testified that the victims

18   used their military identification cards to get on base earlier that evening, were always

19   required to show them to get on base, and were therefore in possession of them that night,

20   but they were not found on their bodies. The fact that they were in the military was also

21   relevant to the prosecution theory that it would have taken more than one teenager to rob

22   and kill two young Navy men. Although the prosecutor's comment about the victims

23   serving their country when they were killed seems to have strayed somewhat from a

24   relevant comment on those issues, it was objectively reasonable for the state appellate court

25   to find that such a mild comment regarding relevant evidence did not improperly appeal to

26   the sympathy of the jury. There is, therefore, no basis to find that the comment "so infected

27   the trial with unfairness as to make the resulting conviction a denial of due process."

28   <u>DeChristoforo</u>, 416 U.S. at 643; <u>see also</u> <u>Smith v. Phillips</u>, 455 U.S. 209, 219 (1982) ("The

1  touchstone of due process analysis in cases of alleged prosecutorial misconduct is the

2  fairness of the trial, not the culpability of the prosecutor.") Even if the prosecutor's remarks

3  could be read to seek the sympathy of the jury for the victims on the basis that they were

4  serving their country when they were murdered, in light of the mildness of the comment

5  and the relevance of the evidence, the comment did not infect the trial with unfairness. See

6  Darden, 477 U.S. at 181 n.12 (prosecutor's argument did not deprive petitioner of a fair

7  trial where it "did not manipulate or misstate the evidence, nor did it implicate other

8  specific rights of the accused such as the right to counsel or the right to remain silent.")

9  The state court adjudication of this aspect of Claim 3 is objectively reasonable within the

10  meaning of 28 U.S.C. § 2254(d).

11       With respect to Petitioner's claim the prosecutor committed misconduct by

12  expressing an improper personal belief in the defendants' guilt, the appellate court stated:

13            The prosecutor also argued, in closing, that "(n)obody was there to

14       witness it.  The witnesses are dead.  But just as my heart is beating in my
     chest, those two men stopped the heartbeats of Keith and Cliff."  Defense

15       counsel did not object to the prosecutor's statement.  Elias argues on appeal
     that the prosecutor expressed an improper personal belief in Chavez's and

16       Elias's guilt.

17

18            "A prosecutor may not express a personal opinion or belief in the guilt
        of the accused when there is a substantial danger that the jury will view the

19        comments as based on information other than evidence adduced at trial."
        (People v. Mincey (1992) 2 Cal.4th 408, 447.)  "The general rule is that

20        improper vouching for the strength of the prosecution's case "'involves an

21        attempt to bolster a witness by reference to facts outside the record.'"
        (Citation.)  Thus, it is misconduct for prosecutors to vouch for the strength of

22        their cases by invoking their personal prestige, reputation, or depth of
        experience, or the prestige or reputation of their office, in support of it.

23        (Citations.)    Specifically, a prosecutor's reference to his or her own

24        experience, comparing a defendant's case negatively to others the prosecutor
        knows about or has tried, is improper. (Citation.)  Nor may prosecutors offer

25        their personal opinions when they are based solely on their experience or on

26        other facts outside the record. (Citations.)" (People v. Huggins (2006) 38

27        Cal.4th 175, 206-07.)

28  ///

1         Elias argues that the context of the prosecutor's statement, made after
2 the prosecutor presented her theory of how the crime occurred, created a
substantial risk that the jury interpreted the statement as being based on facts
3 outside the record. We disagree. While the prosecutor did vouch for her case,
4 neither the content nor the context of the prosecutor's statement indicated to
the jury that her belief in Chavez's and Elias's guilt was based on anything
5 other than the facts admitted in evidence. The prosecutor repeatedly
6 referenced the facts and evidence in the record during her closing argument
and argued the prosecution's view of the reasonable inferences to be drawn
7 therefrom. We discern no error or misconduct under these circumstances.
8 Again, in light of our conclusion. We need not address issues of forfeiture or
ineffective assistance of counsel.
9

10 (Lodgment No. 5, <u>People v. Chavez, et al.</u>, No. D061946, slip op. at 36-37.)

11         In order to show that the prosecutor impermissibly vouched for the strength of her

12 case, Petitioner must show the prosecutor placed "the prestige of the government" behind

13 her statement by personally assuring the strength of the prosecution's case or suggesting

14 that she was in possession of additional information not presented at trial which supported

15 the government's case. <u>United States v. Ruiz</u>, 710 F.3d 1077, 1085 (9th Cir. 2013); <u>United</u>

16 <u>States v. McChristian</u>, 47 F.3d 1499, 1506 (9th Cir. 1995); <u>see also</u> <u>United States v.</u>

17 <u>McKoy</u>, 771 F.2d 1207, 1210-11 (9th Cir. 1985) ("The rule that a prosecutor may not

18 express his personal opinion of the defendant's guilt or his belief in the credibility of a

19 witness is firmly established.") Although the prosecutor vouched for the strength of her

20 case by presenting her personal opinion of guilt, there is no indication in the record that the

21 jury may have believed she was knew of evidence that had not been presented at trial, as

22 opposed to arguing reasonable inferences from the evidence. <u>See</u> <u>United States v.</u>

23 <u>Younger</u>, 398 F.3d 1179, 1190 (9th Cir. 2005) ("It is not misconduct for the prosecutor to

24 argue reasonable inferences based on the record."), quoting <u>United States v. Cabrera</u>, 201

25 F.3d 1243, 1250 (9th Cir. 2000).

26         In addition, instructing the jury that the statements of counsel are not evidence can

27 "neutralize" any affect vouching may have. <u>United States v. Potter</u>, 616 F.2d 384, 392 (9th

28 Cir. 1979). The jury here was instructed that: "Nothing the attorneys say is evidence. In

16cv0320-AJB (KSC)

1    their opening statements and closing arguments, the attorneys will discuss the case, but
2    their remarks are not evidence." (RT 723.)  In fact, the prosecutor began her opening
3    statement by saying:

4           Now the court has instructed you what I say is not evidence.  Opening
     statement wasn't evidence.  This isn't evidence, so if I stand up her and I spin
5    some tale for you, you're not to consider or speculate as to whether or not that
     tale is true, because that's not the facts for you to consider.  [¶]  The only thing
6    for you to consider is anything that came out of the mouth of witnesses after
     they took an oath to tell the truth.  That's it.  You consider the facts.  You have
7    the physical evidence that was admitted.  That's it.  So what I say doesn't count.
8
9    (RT 752.)

10          Clearly established federal law provides for a presumption that jurors follow their
11   instructions.  See Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985) ("The Court presumes
12   that jurors, conscious of the gravity of their task, attend closely the particular language of
13   the trial court's instructions in a criminal case and strive to understand, makes sense of,
14   and follow the instructions given them.")  That presumption may be overcome only where
15   there is "a strong likelihood that the effect of the [error] would be devastating to the
16   defendant." Greer, 483 U.S. at 766 n.8.

17          There is no indication here that the jury believed the prosecutor had placed the
18   prestige of the government behind her statement that she believed in her heart that the
19   defendants were guilty, or that her statement was based on evidence which was not
20   admitted at trial.  She in fact informed the jury at the beginning of his closing argument
21   that she had no intention of doing so, and that if it appeared as if she had they were to
22   ignore her.  In addition, the jury was instructed that anything the prosecutor said was not
23   evidence but merely a comment on the evidence.  Petitioner has not overcome the
24   presumption that the jury followed that instruction because he has not shown there is "a
25   strong likelihood that the effect of the [prosecutor's statement] would be devastating" to
26   his case should the jury have ignored their instructions.  Greer, 483 U.S. at 766 n.8.  The
27   Court finds that the state court adjudication of this aspect of Claim 3 is objectively
28   reasonable within the meaning of 28 U.S.C. § 2254(d).

1    In Petitioner's final allegation of prosecutorial misconduct he alleges the prosecutor
2    disparaged the defense expert witness. The appellate court stated:

3         The prosecutor addressed the defense expert witness, Lisa Dimeo, in
     closing argument as follows: "And I have to comment on the expert. How
4    can I not?" You can hire somebody and have them come in here and say
     anything." Defense counsel objected but was overruled. Elias contends that
5    the prosecutor's comments improperly implied that defense counsel or the
6    expert improperly fabricated evidence.

7
8         "(C)ounsel is free to remind the jurors that a paid witness may
     accordingly be biased and is also allowed to argue, from the evidence, that a
9    witnesses' testimony is unbelievable, unsound, or even a patent 'lie.'
     (Citations.)" (*People v. Arias* (1996) 13 Cal.4th 92, 162.) However, "(i)t is
10   generally improper for the prosecutor to accuse defense counsel of fabricating
11   a defense (citations), or to imply that counsel is free to deceive the jury
     (citation). Such attacks on counsel's credibility risk focusing the jury's
12   attention on irrelevant matters and diverting the prosecution from its proper
13   role of commenting on the evidence and drawing reasonable inferences
     therefore. (Citations.)" (*People v. Bemore* (2000) 22 Cal.4th 809, 846.)
14

15        Although we are reluctant to definitively declare error, given the mild
16   and fleeting nature of the prosecutor's remark, it is possible that a juror could
     reasonably interpret the statement "(y)ou can hire somebody and have them
17   come in here and say anything" as an implicit attack on the credibility of
·18  counsel, who hired the expert, rather than a critique based on the evidence. If
     it was error, however, it was harmless given the nature of the remark, the
·19  context in the prosecution's closing statement, the relative unimportance of
20   the defense expert's testimony (see fn. 3, *ante*), and the substantial evidence
     of Chavez and Elias's guilt introduced at trial. It is not "reasonably probable
21   that a result more favorable to the appealing party would have been reached
22   in the absence of the error." (See *Watson, supra*, 46 Cal.2d at p. 836.)

23   (Lodgment No. 5, <u>People v. Chavez, et al.</u>, No. D061946, slip op. at 37-38.)

24        Reviewing the alleged misconduct in the context of the entire trial as the Court must,
25   <u>DeChristoforo</u>, 416 U.S. at 643, the prosecutor's argument was a proper observation that
26   the defense expert was a paid witness. <u>See</u> <u>United States v. Tucker</u>, 641 F.3d 1110, 1120-
27   21 (9th Cir. 2011) ("A prosecutor may express doubt about the veracity of a witness's
28   testimony (and) may even go so far as to label . . . testimony a fabrication.") In any case,

1   the expert's testimony that the body appeared to have been rolled over a few minutes to a

2   few hours after the victim had been shot in the head because the pool of blood on the ground

3   was not next to his body, was based on her review of the photographs taken at the scene

4   (RT 373, 677-79), which were admitted into evidence (RT 661-62), and was therefore

5   something the jury could have observed for themselves.  Also, the defense expert admitted

6   on cross-examination that she could not tell how long the body had lied on the ground

7   before it was rolled over.  (RT 683.)

8       The record supports the state appellate court's observation that the prosecutor's

9   attack on the credibility of the defense expert was very modest.  The alleged misconduct is

10  not "'of sufficient significance to result in the denial of the defendant's right to a fair trial.'"

11  Greer, 483 U.S. at 765 (1987), quoting Bagley, 473 U.S. at 676; see also Thompson, 74

12  F.3d at 1576 ("Improper argument does not, per se, violate a defendant's constitutional

13  rights."); Williams, 139 F.3d at 744 ("The relevant question is whether the prosecutor's

14  comments so infected the trial with unfairness as to make the resulting conviction a denial

15  of due process.")  The Court finds that the state court adjudication of this aspect of Claim

16  3 is objectively reasonable within the meaning of 28 U.S.C. § 2254(d).

17      In sum, each of the prosecutor's challenged statements, when reviewed in the context

18  of the entire trial, which includes a presumption the jury followed their instruction that

19  nothing the attorneys say is evidence, was not "'of sufficient significance to result in the

20  denial of the defendant's right to a fair trial.'"  Greer, 483 U.S. at 765, quoting Bagley, 473

21  U.S. at 676; DeChristoforo, 416 U.S. at 643.  The Court finds that the silent denial of this

22  claim by the state supreme court, as informed by the appellate court's reasoning and

23  findings, did not involve an objectively unreasonable application of clearly established

24  federal law providing for a presumption that jurors follow their instructions and that

25  prosecutorial misconduct rises to the level of a federal due process violation only where it

26  denies a defendant the right to a fair trial.  Andrade, 538 U.S. at 75-76; Williams, 529 U.S.

27  at 405-07; see also Richter, 562 U.S. at 103 ("As a condition for obtaining habeas relief

28  from a federal court, a state prisoner must show that the state court's ruling on the claim

1  being presented in federal court was so lacking in justification that there was an error well
2  understood and comprehended in existing law beyond any possibility for fairminded
3  disagreement.")   The Court also finds that the state court adjudication of Claim 3 is not
4  based on an unreasonable determination of the facts in light of the evidence presented in
5  the state court proceedings. Miller-El, 537 U.S. at 340.

6      In addition, assuming Petitioner could demonstrate a federal due process violation
7  arising from any of the prosecutor's statements, the Court finds any error to be harmless.
8  Fields v. Woodford, 309 F.3d 1095, 1109 (9th Cir. 2002) ("If prosecutorial misconduct is
9  established, and it was constitutional error, we then apply the Brecht harmless error test."),
10  citing Brecht v. Abrahamson, 507 U.S. 619, 638 (1993) (holding that federal habeas relief
11  is available for an alleged constitutional error only if "in light of the record as a whole" the
12  error had a "substantial and injurious effect or influence in determining the jury verdict.")
13  The Court must determine whether it is "in grave doubt about the likely effect of" any error
14  arising from the prosecutor's statements before the Brecht standard is satisfied. Padilla v.
15  Terhune, 309 F.3d 614, 621-22 (9th Cir. 2002), quoting O'Neal v. McAninch, 513 U.S.
16  432, 435 (1995); see also Kotteakos v. United States, 328 U.S. 750, 765 (1946) ("[I]f one
17  cannot say, with fair assurance, after pondering all that happened without stripping the
18  erroneous action from the whole, that the judgment was not substantially swayed by the
19  error, it is impossible to conclude that substantial rights were not affected.")

20      Assuming the prosecutor committed misconduct by vouching for the strength of her
21  case, appealing to the sympathy of the jury, expressing her personal opinion of guilt, or
22  denigrating the defense expert, those errors are harmless.  The prosecutor herself extolled
23  the jury "not to consider or speculate as to whether or not [any tale I spin] is true," that
24  "what I say doesn't count," and to consider only the testimony and physical evidence
25  admitted at trial.  (RT 752.)  The trial judge instructed the jury that "[n]othing that the
26  attorneys say is evidence," and "[i]n their opening statements and closing arguments, the
27  attorneys will discuss the case, but their remarks are not evidence." (RT 723.)  For those
28  reasons, and because as set forth above the statements were by their nature very mild, it

1   appears unlikely the jury was influenced by the prosecutor's remarks. "[I]n light of the
2   record as a whole" it does not appear the alleged errors had a "substantial and injurious
3   effect or influence in determining the jury verdict." <u>Brecht</u>, 507 U.S. at 638.  The Court is
4   not "in grave doubt about the likely effect of" any error arising from the prosecutor's
5   statements.  <u>O'Neal</u>, 513 U.S. at 435.  The Court therefore recommends habeas relief be
6   denied as to Claim 3.

7        **D.    Claim 4**

8        Petitioner alleges in his final claim that his Fifth, Sixth and Fourteenth Amendment
9   rights were violated because the trial court erred in instructing the jury that evidence of his
10  possession of stolen property by itself is not sufficient to convict him of murder, but such
11  evidence when coupled by "slight" supporting evidence could support a murder conviction.
12  (FAP at 9, 29-30.)  He argues the jurors likely convicted him under this instruction because
13  there was only slight evidence of his guilt, consisting of his DNA on a cigarette butt found
14  at the scene, and his DNA and fingerprints in the stolen truck.  (<u>Id.</u>)

15       Respondent answers that although it was error under state law to give the instruction,
16  which is a modified version of CALCRIM No. 376, the state court adjudication of the
17  claim, on the basis that any error is harmless, is neither contrary to, nor involves an
18  unreasonable application of, clearly established federal law.  (Ans. Mem. at 25-28.)
19  Respondent also argues that any error is harmless because the instruction did not have a
20  substantial and injurious effect or influence on the jury's verdict.  (<u>Id.</u>)

21       Petitioner presented this claim to the state appellate and supreme courts on direct
22  appeal as a federal constitutional claim.  (Lodgment No. 6 at 22-23; Lodgment No. 3 at 34-
23  39.)  The state supreme court summarily denied the claim without citation of authority or
24  a statement of reasoning.  (Lodgment No. 7.)  The claim was denied on the merits in a
25  written opinion by the state appellate court.  (Lodgment No. 5.)  For the same reasons set
26  forth above with respect to Claim 1, the court will look through the silent denial of this
27  claim by the state supreme court and apply the provisions of 28 U.S.C. § 2254(d) to the
28  appellate court opinion.  <u>Ylst</u>, 501 U.S. at 803-06.

The appellate court stated:

Chavez and Elias argue that it was error for the court to refer to "murder" in this instruction because the legal principle embodied by CALCRIM No. 376 applies only to theft-based offenses such as robbery, burglary, or receiving stolen property. (See *People v. McFarland* (1962) 58 Cal.2d 748, 755.) In *People v. Barker* (2001) 91 Cal.App.4th 1166, this court held that it was error to include the crime of murder in the prior pattern jury instruction based on this principle (CALJIC No. 2.15) because the same natural and logical inferences that link the possession of stolen property with theft-based offenses do not apply in the same way to the crime of murder. (*Barker*, at pp. 1175-1176; see *People v. Prieto, supra*, 30 Cal.4th at pp. 248, 249 ("We find *Barker* persuasive and hold that the trial court's application of CALJIC No. 2.15 to nontheft offenses like rape or murder as improper.").) The Attorney General concedes that the trial court here erred.

The issue presented is thus whether the trial court's error was prejudicial. An instructional error is prejudicial if, "'after an examination of the entire cause, including the evidence,' (the reviewing court) is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); see *People v. Gamache* (2010) 48 Cal.4th 347, 376 (holding that *Watson* applies to analogous instructional error).) "The *Watson* standard provides that an error is harmless unless the appellant shows it is reasonably probable a result more favorable to the appellant would have been reached had the error not occurred." (*People v. Harden* (2003) 110 Cal.App.4th 848, 859.)

Here, Chavez and Elias argue that instructing the jury with the modified version of CALCRIM No. 376 lowered the prosecution's burden of proof and provided an improper evidentiary pinpoint instruction that was prejudicial given the evidence presented at trial. Elias further argues that this instruction was prejudicial because his possession of stolen property was allegedly unclear.

In view of the totality of the instructions provided, we disagree with Chavez and Elias's contention that the instruction's reference to "slight corroborating evidence" lowered the prosecution's burden of proof. As given, the instruction itself contained the following admonition directly after it reference to "slight corroboration evidence": "Remember that you may not convict the defendant of any crime unless you are convinced that each fact essential to the conclusion that the defendant is guilty of that crime has been

proved beyond a reasonable doubt." Any confusion the jury may have had was resolved promptly by that clear and express statement of the prosecution's burden in the instruction itself. Moreover, the court fully and correctly instructed the jury regarding the elements of the charged offenses and the prosecution's burden of proof in other instructions. Even without the express admonition at the close of CALCRIM No. 376, those instructions alone were sufficient to ensure that the jury would not misapply the burden of proof in this case. (*People v. Barker, supra*, 91 Cal.App.4th at p. 1177 ("we can find no possibility such instruction (i.e., CALJIC No. 2.15) suggested that the jury need not find all the statutory elements of murder had been proven beyond a reasonable doubt"); *People v. Gamache, supra*, 48 Cal.4th at p. 376.)

The instruction's specific reference to possession of stolen property, and the inferences that "may" be drawn therefrom, also was not prejudicial error. Additional instructions provided the jury with the appropriate weight to be placed on circumstantial evidence, the scope and effect of permissible inferences from the evidence, and the responsibility of the jury to weigh the evidence independently. We find it unlikely that the jury ignored these additional instructions in favor of the modified version of CALCRIM No. 376 given here. [Footnote omitted] CALCRIM No. 376 instructs the jury that they "may" find certain evidence sufficient to find a defendant guilty. It does not contradict the additional instructions that place bounds on the jury's consideration of evidence. Chavez's reliance on authority where a court gave expressly inconsistent or erroneously mandatory instructions is therefore unpersuasive. (See *LeMons v. Regents of University of California* (1978) 21 Cal.3d 869, 878; *Francis v. Franklin* (1985) 471 U.S. 307, 322.)

We likewise find unpersuasive Elias's argument that the court's use of CALCRIM No. 376 was prejudicial because the evidence of his "possession" of the truck was uncertain. In *People v. Rubio* (1977) 71 Cal.App.3d 757, the court held that when a defendant's possession of stolen property was "an open question," CALJIC No. 2.15 should not be used because it "assumed that the evidence established, without dispute, defendant's possession of stolen property." (*Rubio*, at p. 768.) At the time, however, CALJIC No. 2.15 was materially different than the instruction given here. CALJIC No. 2.15 stated: "'The mere fact that a person was in conscious possession of recently stolen property is not enough to justify his conviction of the crime charged . . . .'" (*Rubio*, at p. 767.) By contrast, CALCRIM No. 376 phrases the predicate findings conditionally and emphasizes the jury's responsibility for any such findings: "*If you conclude* that he defendant knew (he) possessed property and *you conclude* that the property had in fact been recently (stolen) . . . ." (Italics added.) The concerns expressed in *Rubio* and, later, in *People v. Morris*

1    (1988) 46 Cal.3d 1, 40-41, thus have no application to the instruction at issue

2    here.

3         In light of the substantial circumstantial evidence admitted at trial

4    tending to prove Chavez and Elias's guilt, the forensic evidence tying Chavez

     and Elias to the crime scene and the victims, and the foregoing discussion of

5    the potential effects of the trial court's erroneous use of CALCRIM No. 376

6    here, we conclude it is not reasonably probable that a result more favorable to

     Chavez and Elias would have been reached in the absence of this instruction

7    error.   (See *Watson, supra*, 46 Cal.2d at p. 836.)   Although the court's

8    application of CALCRIM No. 376 to the crime of murder was error, as the

     Attorney General concedes, the error was harmless in this case.

9

10   (Lodgment No. 5, <u>People v. Chavez, et al.</u>, No. D061946, slip op. at 30-33.)

11        Clearly established federal law provides that a defective reasonable doubt instruction

12   "vitiates all the jury's findings" and is structural error, not amenable to harmless error

13   analysis. <u>Sullivan v. Louisiana</u>, 508 U.S. 275, 281 (1993); <u>Byrd v. Lewis</u>, 566 F.3d 855,

14   862 (9th Cir. 2009).  Instructional errors which do not categorically negate all the jury's

15   findings are reviewed for harmless error.  <u>Hedgpeth v. Pulido</u>, 555 U.S. 57, 61 (2008);

16   <u>Neder v. United States</u>, 527 U.S. 1, 12 (1999).

17        Here, the jury was given a proper reasonable doubt instruction. (RT 722.) The trial

18   judge repeatedly instructed the jury that the prosecution bore the burden of proof beyond a

19   reasonable doubt.  (RT 722, 729, 730, 732, 736, 742, 743, 744, 745, 748, 751.)   The

20   prosecutor and defense counsel repeatedly reminded the jury during closing argument that

21   the prosecution had the burden of proof beyond a reasonable doubt. (RT 767, 787, 794,

22   795, 801, 804, 805, 806, 812, 813, 820, 821, 822, 823, 826.)  In fact, the challenged

23   instruction was immediately followed by: "Remember that you may not convict the

24   defendant of any crime unless you are convinced that each fact essential to the conclusion

25   that the defendant is guilty of that crime has been proved beyond a reasonable doubt." (RT

26   732.)  Thus, to the extent the challenged instruction, which the parties admit was error

27   under state law, rises to the level of a federal constitutional violation, it is subject to

28   harmless error analysis. <u>Pulido</u>, 555 U.S. at 61.

16cv0320-AJB (KSC)

1    In order for the challenged jury instruction to rise to the level of a federal
2  constitutional violation, Petitioner must demonstrate that the instruction "so infected the
3  entire trial that the resulting conviction violates due process." Estelle v. McGuire, 502 U.S.
4  62, 72 (1991), quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973).  In addition, "[i]t is
5  well established that the instruction 'may not be judged in artificial isolation,' but must be
6  considered in the context of the instructions as a whole and the trial record." McGuire, 502
7  U.S. at 72, quoting Cupp, 414 U.S. at 147.

8    The state court correctly observed that the jury was properly instructed on reasonable
9  doubt, and that even if the challenged instruction had the potential for confusion, that
10 potential went unrealized because the instruction was immediately followed by the
11 admonition: "Remember that you may not convict the defendant of any crime unless you
12 are convinced that each fact essential to the conclusion that the defendant is guilty of that
13 crime has been proved beyond a reasonable doubt."   (RT 732.)   In light of those
14 instructions, and the fact that the jury was repeatedly reminded of the beyond a reasonable
15 doubt requirement, there is no basis to find that challenged instruction "so infected the
16 entire trial that the resulting conviction violates due process." McGuire, 502 U.S. at 72,
17 quoting Cupp, 414 U.S. at 147; see also Franklin, 471 U.S. at 324 n.9 ("The Court presumes
18 that jurors, conscious of the gravity of their task, attend closely the particular language of
19 the trial court's instructions in a criminal case and strive to understand, makes sense of,
20 and follow the instructions given them.")  In order to overcome that presumption, Petitioner
21 must show "a strong likelihood that the effect of the [error] would be devastating to the
22 defendant."   Greer, 483 U.S. at 766 n.8.  Petitioner has not made such a showing with
23 respect to the challenged instruction because the jury was repeatedly reminded of the
24 reasonable doubt instructions by the trial judge and the attorneys, including immediately
25 following the instruction.  Accordingly, the Court finds that the state-law instructional error
26 did not rise to the level of a federal constitutional error.

27    However, clearly established federal law provides that when a state court finds a
28 federal constitutional violation, the state court is required to determine whether the error is

1   harmless beyond a reasonable doubt.  See Chapman v. California, 386 U.S. 18, 24 (1967)
2   (holding "that before a federal constitutional error can be held harmless, the [state] court
3   must be able to declare a belief that it was harmless beyond a reasonable doubt.")
4   Deference under 28 U.S.C. § 2254(d) does not apply where the state court uses a wrong
5   legal standard.  Wade v. Terhune, 202 F.3d 1190, 1195 (9th Cir. 2000).

6           As quoted above, the state court found that giving the challenged instruction was
7   error under state law, and went on to find the error harmless because "it is not reasonably
8   probable that a result more favorable to Chavez and Elias would have been reached in the
9   absence of this instruction error." (Lodgment No. 5, People v. Chavez, et al., No. D061946,
10  slip op. at 33.)  To the extent the challenged instruction resulted in a federal constitutional
11  error, the application by the state court of a harmless error test different than the Chapman
12  standard would preclude this Court from applying the provisions of 28 U.S.C. § 2254(d).
13  Wade, 202 F.3d at 1195.  However, as discussed above, the instruction did not amount to
14  federal constitutional error.  Accordingly, the Court finds that the state court adjudication
15  of this claim is neither contrary to, nor involves an unreasonable application of, clearly
16  established federal law which provides that a federal due process violation only arises when
17  the challenged instruction "so infected the entire trial that the resulting conviction violates
18  due process."  McGuire, 502 U.S. at 72, quoting Cupp, 414 U.S. at 147.  The Court also
19  finds that the state court adjudication of this claim does not involve an unreasonable
20  determination of the facts in light of the evidence presented in the state court proceedings.
21  Miller-El, 537 U.S. at 340.

22          Finally, even were the court to find the instructional error rose to the level of a federal
23  constitutional violation and therefore the provisions of 28 U.S.C. § 2254(d) do not apply,
24  or Petitioner could otherwise satisfy those provisions, habeas relief is still unavailable if
25  the error is harmless.  Pulido, 555 U.S. at 61; Neder, 527 U.S. at 12.  The instruction did
26  not directly address the burden of proof, which the jury was repeatedly instructed upon by
27  the judge and reminded of by the attorneys.  In fact, it instructed the jury that they could
28  not convict the defendants of murder based solely on their possession of recently stolen

1    property, and told them that if they found the defendants possessed recently stolen property

2    they were required to consider "how, where, and when the defendant possessed the

3    property, along with any other relevant circumstances tending to prove his guilt of murder."

4    (RT 731-32.) And the instruction was immediately followed by: "Remember that you may

5    not convict the defendant of any crime unless you are convinced that each fact essential to

6    the conclusion that the defendant is guilty of that crime has been proved beyond a

7    reasonable doubt." (RT 732.)

8         Because the instruction did not mislead the jury regarding the burden of proof, and

9    "in light of the record as a whole" which includes substantial evidence supporting the

10   convictions, the Court finds that the challenged jury instruction did not have a "substantial

11   and injurious effect or influence in determining the jury verdict." Brecht, 507 U.S. at 638.

12   The Court is not "in grave doubt about the likely effect of" any error arising from the

13   challenged instruction. O'Neal, 513 U.S. at 435.

14        The Court finds that the state court adjudication of Claim 4 is objectively reasonable

15   within the meaning of 28 U.S.C. § 2254(d), and that even if Petitioner could satisfy that

16   standard, any error is harmless.  The Court therefore recommends denying habeas relief

17   with respect to Claim 4.

18   **IV.   CONCLUSION**

19        For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court

20   issue an Order: (1) approving and adopting this Report and Recommendation, and (2)

21   directing that Judgment be entered denying the Petition.

22        **IT IS ORDERED** that no later than **30 days from the issuance of this Order**, any

23   party to this action may file written objections with the Court and serve a copy on all

24   parties. The document should be captioned "Objections to Report and Recommendation."

25   / / /

26   / / /

27   / / /

28   / / /

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **ten days after being served with the objections.** The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

DATED: _3/24/17_

KAREN S. CRAWFORD
UNITED STATES MAGISTRATE JUDGE

16cv0320-AJB (KSC)